**WACHOVIA BANK AND TRUST COMPANY and George A. Shuford, Successor Cotrustees of the Evelyn Grove Seely Trust, Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 8232.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 17, 1961.

Decided March 28, 1961.

Herbert L. Hyde, Asheville, N. C. (Van Winkle, Walton, Buck & Wall, Asheville, N. C., on the brief), for appellants.

Carolyn R. Just, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., and J. M. Baley, Jr., U. S. Atty., Asheville, N. C., on the brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

This is an appeal from the District Court for the Western District of North Carolina which granted defendant's motion for a directed verdict, dismissed the action brought to recover alleged overpayments of federal income taxes, and entered judgment in favor of the United States.[1] Upon a review of the whole record, we conclude to affirm.

The Wachovia Bank and Trust Company and George A. Shuford, as taxpayers, are the successor cotrustees of a trust created on October 7, 1949, by one Evelyn Grove Seely. Under the trust conveyance, the original trustees were given certain powers including the power to manage and operate the Battery Park Hotel, a business property situate in Asheville, North Carolina, to organize corporations as they deemed necessary in the administration of the trust estate and to transfer to such corporations any part of the trust estate. In May of 1951, the original trustees organized, under the laws of Florida, a corporation designated as Community Hotels, Inc., hereinafter referred to as Community, which was capitalized at $5,000, all of the stock being owned by the trustees. Community took a ten-year lease, commencing June 1, 1951, on a property located in Daytona Beach, Florida, known as the Seabreeze Manor Hotel. In order to recondition this leased property and make it suitable for commercial operation, the trustees in 1951 initially transferred to Community $23,756.11 of accumulated trust principal and earnings. This transfer was purportedly evidenced by a promissory note bearing four per cent interest, although the note was not introduced as it could not be found. Taxpayers' books reveal that no interest thereon was ever accrued or paid. Subsequently, more than fifty further transfers of trust funds were made to Community which, by 1955, totaled some $98,326.17, none of which was claimed to have been evidenced by note or written instrument, and of the total advances only $3,000 was ever repaid to the trust by Community.

As a result of disagreement as to the management of the trust and the investment in Community,[2] a trust beneficiary in 1954 brought an action in a North Carolina Superior Court for a change of trustees and on October 5, 1954, that court appointed one Johnson as conservator of the trust, granting to him all the powers and duties of a receiver as sole manager of the trust to the exclusion of the original trustees. In his first report to the court on December 21, 1954, the conservator noted a total indebtedness of $98,326.17 due the trust from Community but recommended continuation of

1. The District Court did not file an opinion and the judgment is not reported.

2. The Community operation was undertaken primarily as a "feeder" to serve the Battery Park Hotel in Asheville. The hotel business in Asheville was seasonal, with a good summer business but slack during the winter months. The Florida hotel business was also seasonal, best during the winter season and slackening during the summer months. It was therefore anticipated that personnel could be transferred from one hotel to the other during complementary seasons, advertising and other overhead expenses being profitably shared.

Community operation until May 1, 1955, in order to determine whether the operation might be profitable and to recover some of the trust advances, if possible. At a July meeting with the trust beneficiaries and their counsel, the conservator stated his conclusion that Community would never have sufficient earnings to repay the trust advances and recommended the amount of such advances be charged off as uncollectible and that Community be liquidated. The conservator additionally reported the receipt of offers to purchase trust properties, including the offer of one Sammons, dated July 9, 1955, to purchase the Battery Park Hotel for $850,000 and the Seabreeze lease and accounts for $50,000, or, alternatively, to purchase only the Battery Park Hotel for $850,000; and an offer submitted by one Puckett, dated July 15, 1955, to purchase the Battery Park Hotel for $900,000. Later, on July 23, Puckett amended his offer to include $5,000 for the stock of Community and $10,000 for the so-called accounts receivable of the trust from Community. On July 25 Sammons increased his bid price to $927,500. On July 30, after having been notified by counsel that the beneficiaries would approve a sale of the trust properties, the conservator recommended to the court that the properties be sold. On August 5, Puckett increased his offer for the so-called accounts receivable charged by the trust to Community from $10,000 to $20,000, and on August 9 the Superior Court authorized

acceptance. The accounts receivable were not charged off as worthless prior to their sale to Puckett which was consummated on September 30, but on that same date, for the first time, a loss on the amount of funds advanced to Community by the trust was recorded in the trust books by means of a closing entry in the general ledger. The conservator testified that the sale of the Battery Park Hotel was part of the agreement for the sale of the stock of Community and the so-called accounts receivable.

On October 7, 1955, taxpayers were appointed successor cotrustees of the Seely trust and they subsequently prepared and filed the trust's federal income tax return for the fiscal year ending September 30, 1955, claiming a fully deductible business bad-debt loss of $78,326.17 on the sale of the accounts receivable charged to Community,[3] reflected as follows:

| Date of Sale | September 30, 1955 |
|---|---|
| Cost | $98,326.17 |
| Sale Price | 20,000.00 |
| Loss | 78,326.17 |

On taxpayers' return they reported a long-term capital gain of $198,447.54 on the sale of the Battery Park Hotel and claimed a fifty per cent deduction for net long-term capital gain in the amount of $99,223.77. The Commissioner treated the advances by the trust as capital assets, contributions to capital of Community, and required the taxpayers to off-

3. Taxpayers herein rely upon the following Code sections and Regulations, all statutory references being to the Internal Revenue Code of 1954 as contained in 26 U.S.C.A. (1955):
"Section 166. Bad debts
"(a) General rule.—
"(1) Wholly worthless debts.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.
"(2) Partially worthless debts.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction."

"26 C.F.R. § 1.166–2 (1960). Evidence of worthlessness.
"(a) General rule. In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor.
"(b) Legal action not required. Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166."

set the $78,326.17 loss (as a loss from the sale of capital assets) against the total long-term capital gain and allowed the taxpayers only fifty per cent of the difference of $119,456.37, or $59,728.18, as a deduction for net long-term capital gain.[4] Taxpayers paid the asserted deficiency and, after denial of their claim for a refund, instituted the present action and demanded a jury trial.

Both taxpayers and Government filed requests for admissions and answers thereto and produced witnesses and documentary evidence at the trial. At the conclusion of the evidence, the District Court directed a verdict for the Govern-

4. The following Code sections and Regulations are asserted by the Government as applicable, all statutory references being to Subchapter P "Capital Gains and Losses" of the Internal Revenue Code of 1954 as contained in 26 U.S.C.A.:

"§ 1201. Alternative tax

\* \* \* \* \*

"(b) Other taxpayers.—If for any taxable year the net long-term capital gain of any taxpayer (other than a corporation) exceeds the net short-term capital loss, then, in lieu of the tax imposed by sections 1 and 511, there is hereby imposed a tax (if such tax is less than the tax imposed by such sections) which shall consist of the sum of—

"(1) a partial tax computed on the taxable income reduced by an amount equal to 50 percent of such excess, at the rate and in the manner as if this subsection had not been enacted, and

"(2) an amount equal to 25 percent of the excess of the net long-term capital gain over the net short-term capital loss."

"§ 1202. Deduction for capital gains

"In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 percent of the amount of such excess shall be a deduction from gross income. \* \* \*."

"§ 1211. Limitation on capital losses

\* \* \* \* \*

"(b) Other taxpayers.—In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. For purposes of this subsection, taxable income shall be computed without regard to gains or losses from sales or exchanges of capital assets and without regard to the deductions provided in section 151 (relating to personal exemptions) or any deduction in lieu thereof. \* \* \*."

"§ 1221. Capital asset defined

"For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

\* \* \* \* \*

"(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1) \* \* \*."

"26 C.F.R. § 1.166–1 Bad debts.

\* \* \* \* \*

"(c) Bona fide debt required. Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166. \* \* \*."

"26 C.F.R. § 1.166–3 Partial or total worthlessness.

\* \* \* \* \*

"(2) Charge-off required. (i) If, from all the surrounding and attending circumstances, the district director is satisfied that a debt is partially worthless, the amount which has become worthless shall be allowed as a deduction under section 166(a) (2) but only to the extent charged off during the taxable year."

"26 C.F.R. § 1.1221–1 Meaning of terms.

\* \* \* \* \*

"(d) Section 1221(4) excludes from the definition of 'capital asset' accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of stock in trade or inventory or property held for sale to customers in the ordinary course of trade or business. Thus, if a taxpayer acquires a note receivable for services rendered, reports the fair market value of the note as income, and later sells the note for less than the amount previously reported, the loss is an ordinary loss. On the other hand, if the taxpayer later sells the note for more than the amount originally reported, the excess is treated as ordinary income."

ment and granted Government's motion to dismiss the taxpayers' complaint. On appeal from the judgment entered thereon, taxpayers contend: That all the transfers of trust funds to Community were, in fact, loans by the trust which imposed upon Community a binding obligation for repayment; that the resulting debts owed by Community to the trust were incurred in the course of and proximately related to the trade or business of the hotel operations of the trust;[5] that these debts became partially if not wholly worthless during the taxable year; that evidence introduced in support of these contentions was sufficient to raise a prima facie case, thereby requiring jury determination whether the trust advances qualified for deduction under the business bad-debt sections of the Internal Revenue Code. The Government contends the undisputed facts of record conclusively show the trust advances to Community were not loans but were in substance, if not in form also, contributions to the capital of Community and were, therefore, subject to tax treatment under the capital gains deduction sections of the Code. The Government further contends that, even if the advances, the so-called accounts receivable, were loans or debts, their sale was nevertheless a transaction within the scope of the capital gains and losses provisions and the resulting loss is deductible only to the extent therein provided; that a charge-off of a bad debt under section 166(a) (2) cannot be recognized after a taxpayer has sold the debt, nor may a taxpayer charge off a bad debt where it is not done before a sale and where, as here, the charge-off is not independent of the sale; that any charge-off here was made merely to record the sale; that, even if it had been independent of the sale, there was no showing of a determination, by the conservator or the Superior Court, of worthlessness during the taxable year.

Since the evidence introduced by both parties was in all essential aspects undisputed and uncontroverted, a summary analysis thereof will demonstrate that the advances in question, even though carried as accounts receivable based on loans, were in fact contributions to the capital of Community.

It is certain that if the taxpayers' loss occurred as the result of the sale of what were in substance capital assets, they would not be entitled to the deduction of that loss as a business bad debt. To support the contention that evidence indicated the trust advances could be considered as loans or debts, taxpayers direct attention to the promissory note which purportedly secured the initial $23,756.11 advance; the repayment by Community of $3,000; and the financial records, audit reports and tax returns of both the trust and Community disclosing that the advances were respectively recorded as accounts receivable and accounts payable. Acknowledging the foregoing as established by the evidence, it is equally clear from additional undisputed evidence that: The promissory note said to have secured the first advance of $23,756.11 was never produced and has never been found; none of the over fifty subsequent advances was in any manner evidenced by written instrument or secured; although Community did transfer $3,000 back to the trust, this was the only repayment ever made or attempted out of the total of $98.326.17 advanced by the trust; no interest was ever paid or accrued by Community on any part of the advances; no date for or schedule of repayment was ever established; even though the trust advances were recorded at various times in the form of loans or debts, all such advances *and* the stock of Community were originally recorded in the trust books in a single account receivable; and when the stock was separately shown in an independent capital stock account during a 1953 semi-annual audit, the then total amount of advances, $94,414.39, was reflected as an investment listed under cur-

---

5. The Government did not dispute the contention that the transfers were made in the course of the trust's trade or business.

rent trust assets. Moreover, it is apparent that from its inception Community was singularly under-capitalized. Although its sole capital was the $5,000 paid for its stock by the original trustees, one of the then cotrustees testified that at the very time the venture was organized, it had been estimated that an additional $50,000 to $60,000 would be necessary to put the corporate property in operating condition. This proved to be a substantial underestimate. In addition to a required deposit of $5,000 (the full capitalization of Community) on the lease and to rental payments of $1,500 per month, advances were necessary to pay $20,000 for basic decoration, improvement and airconditioning, $13,000 for painting and carpentry work, $1,200 for a deposit with a power company and large amounts for additional equipment in the kitchen, a new piano, bar and new furniture. To meet these basic capital expenditures and to supply funds for payroll and other current operating expenses, the trust was required to advance to Community a total of $32,-738.52 during the first four months of operation, $59,102.75 during the first eight months, $74,189.40 by the end of sixteen months, $94,414.39 within a little less than two years and a final total of $98,326.17 by the end of the third year. During this same period, Community was experiencing substantial and continued losses resulting in operating deficits amounting to $27,436.87 at the end of the first fiscal year, $51,516.76 at the end of the second year, $62,743.20 the third year and $64,166.75 by the end of the fourth year of operation.

The standards by which it is to be determined whether, under the facts of the case as set out above, the trust advances were contributions to the capital of Community, or whether they were and are to be treated as having been loans or debts, have been well stated by the Tax Court in the case of Martin M. Dittmar, 1955, 23 T.C. 789, 795–797, as follows (omitting all citations):

"The first question we must decide is whether petitioner's advances to Lone Star [a subsidiary corporation wholly owned by taxpayer-petitioner] were loans or were capital contributions. Petitioner contends, and has the burden of proving, that the advances were loans and that he is entitled to a full deduction, as a business bad debt, * * * of the unpaid balance thereof. * * *.

"This question is one of fact. And in deciding whether or not a debtor-creditor relation resulted from advances, the parties' true intent is relevant. Bookkeeping, form, and the parties' expressions of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered, for the parties' formal designations of the advances are not conclusive, but must yield to 'facts which even indirectly may give rise to inferences contradicting' them. * * *.

\* \* \* \* \* \*

"Petitioner testified that he knew the sawmill venture was speculative and hazardous. Yet despite that—and in the face of net losses by Lone Star in every year of its corporate existence save one, corresponding increases in Lone Star's deficit, and its apparent insolvency * * * petitioner continued to make advances without ever charging interest, receiving written evidence of Lone Star's indebtedness, setting a definite date of repayment, or taking any security. In fact, advances were made throughout and after the * * time, petitioner testified, he realized Lone Star could not be operated at a profit. * * * It is evident from the above, as well as from petitioner's testimony that the 627 advances he made to Lone Star throughout its corporate existence were dictated solely by Lone Star's needs, that a disinterested creditor certainly would not have continued to advance funds for a deficit operation such

as Lone Star. Further, the all-inclusive nature of the advances made by petitioner (i. e., for capital assets, working capital, and to enable Lone Star to meet specific obligations), plus the added fact that no effort was ever made to borrow money for Lone Star from other sources, indicate that the parties understood that petitioner was to underwrite all of the corporation's financial requirements."

\* \* \* \* \* \*

" \* \* \* we cannot avoid the inference that petitioner never did intend to enforce payment of the advances or assert the rights of a genuine creditor and that, in fact, his 'state of mind \* \* \* [with respect to the advances] was akin to that of the ordinary shareholder, who understands that his investment is subject to the risks of the venture and the prior claims of creditors.'

"It is our conclusion that the record belies the formal characterization of petitioner's advances as loans \* \* \*. We hold, therefore, that the \* \* \* advances to Lone Star represented capital contributions, deduction for the worthlessness of which is governed and limited by the provisions of sections 23(g) and 117 of the 1939 Code" [now § 165 and Subchapter P, respectively].

See Gilbert v. Commissioner of Internal Revenue, 2 Cir., 1957, 248 F.2d 399, affirmed on rehearing, 2 Cir., 1959, 262 F. 2d 512, 515.

■ In determining that the advances were, in fact, contributions to the capital of Community, one of the very pertinent circumstances, and the inference arising therefrom, is that the stock of the purported "debtor" was wholly owned by the taxpayers. See Arlington Park Jockey Club v. Sauber, 7 Cir., 1959, 262 F.2d 902, 906. But there are other relevant circumstances to be noted. Shortly following its creation, Community had assets consisting solely of a ten-year lease on an improvement requiring extensive repair and capital outlay, and $5,000 of available capital which was immediately expended in full as deposit for rent. In order to begin and subsequently maintain its operations, Community required advances totaling over nineteen times its capital. No attempt was ever made to obtain these necessary funds from any source other than the trust. The money thus advanced was expended almost entirely for construction, repairs, fixtures and equipment, items clearly of a capital nature, and the balance thereof was used to meet current operating expenses. Only one of the many advances was said to have been evidenced by a note, and that note itself has been lost. No interest was ever accrued, paid or demanded on the note or other advances, no repayment schedule was established and no security was ever provided. Every year of continued operation resulted in ever increasing operating deficits, precluding any reasonable hope that any substantial portion of the advances could ever be returned. It would be unrealistic to believe that an objective and disinterested investor would have supplied funds in the amounts advanced by the trust with "reasonable expectations of repayment regardless of the success of the venture." Gilbert v. Commissioner of Internal Revenue, 2 Cir., 1957, 248 F.2d 399, 406. Rather, the evidence shows the funds were advanced by the trustees, as stockholders, to protect and expand the original capital investment and at the risk of the success of the venture. The undisputed facts and circumstances preclude the characterization of these advances as loans.

As earlier noted, the District Court filed no opinion and we are not informed as to the basic reasons for the directed verdict and the order of dismissal. Taxpayers earnestly contend that questions of fact were presented for jury determination: (1) Whether the advances were loans or contributions to capital, and (2) whether the alleged debts became wholly or partially worthless and were charged off during the taxable year.

■ As we view the evidence in this case, the facts were either undisputed or uncontrovertible. It is a well recognized principle that, on a motion for a directed verdict, the court must draw against the party making the motion all inferences most favorable to the party opposing the motion. But it has been decided that a directed verdict is proper where the evidence is without dispute or is so conclusive that if a verdict were returned for the party against whom the motion is directed, the exercise of sound judicial discretion would require that it be set aside. The late Chief Judge Parker, speaking for this court, said:

> "Verdict can be directed only where there is no substantial evidence to support recovery by the party against whom it is directed or where the evidence is all against him or so overwhelmingly so as to leave no room to doubt what the fact is."

Garrison v. United States, 4 Cir., 1932, 62 F.2d 41, 42. In another case arising in this circuit, Judge Soper wrote as follows:

> "In the federal courts the judge should direct a verdict for either party, even if the party has the burden of proof, when the facts are so convincing that reasonable men could not differ as to their significance; and this is especially true when there is no conflict in the evidence. * * 'When, on the trial of the issues of fact in an action at law before a Federal court and a jury, the evidence, with all the inferences that justifiably could be drawn from it, does not constitute a sufficient basis for a verdict for the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party.' "

United States v. Grannis, 4 Cir., 1949, 172 F.2d 507, 513. See also: Brady v. Southern Ry. Co., 1943, 320 U.S. 476, 479–480, 64 S.Ct. 232, 88 L.Ed. 239; Penna R. Co. v. Chamberlain, 1933, 288 U.S. 333, 343, 53 S.Ct. 391, 77 L.Ed. 819; Norfolk Southern Ry. Co. v. Davis Frozen Foods, 4 Cir., 1952, 195 F.2d 662, 665; Wright v. Grain Dealers Nat. Mut. Fire Ins. Co., 4 Cir., 1950, 186 F.2d 956, 958; Hartman v. Baltimore & Ohio R. Co., 4 Cir., 1937, 89 F.2d 425, 426–427; Kennedy Lumber Co. v. Rickborn, 4 Cir., 1930, 40 F.2d 228, 231.

Even were it not clearly apparent that the advances in question were contributions to capital and even if it be assumed they were in the nature of loans or debts, the judgment below should be upheld.

While the taxpayers have contended there was a question of fact whether the advances made to Community were wholly or only partially uncollectible, it is an uncontroverted fact that the stock of Community was purchased for its full par value and the "account receivable" charged to Community was separately purchased for the sum of $20,000; thus it is clear that the account was only *partially* uncollectible. Had it been *wholly* uncollectible (and had it been in the form of a debt), it is conceded that the taxpayers would have been entitled to a deduction for a business bad debt upon a showing of such worthlessness during the taxable year. 26 U.S.C.A. § 166(a) (1). But since the account was only partially uncollectible, the taxpayers would be required to show not only the extent of worthlessness but also that the unrecoverable amount was in some manner charged off during the taxable year. 26 U.S.C.A. § 166(a) (2).

■ In the instant case, the conservator affirmatively testified that the loss on the account receivable was not charged off on the books or records of the trust prior to sale,[6] and undisputed evi-

6. Taxpayers conceded in their brief that "there did not appear a written notation in the trust journal or accounts receivable concerning the worthlessness of the debt." This they contend was of "little significance." While there is no precise

dence showed that the only charge-off occurred on the same day the sale was consummated. It is clear that if the charge-off of an alleged bad debt and its sale occur on the same day pursuant to prior negotiations for sale, the taxpayer will not be entitled to a bad-debt deduction for he is then, in reality, attempting to write off the loss on a debt that he no longer owns. Mitchell v. Commissioner of Internal Revenue, 2 Cir., 1951, 187 F.2d 706, 707. Considering the factors now relied upon by taxpayers to have constituted a determination of worthlessness, viz., the conservator's report to the trust beneficiaries on July 22, 1955, the report to the court on July 30, 1955, and the court order approving the sale of August 9, 1955,[7] the same principle must apply. For it is plain that even though these reports were made and the order was entered prior to the consummation of the sale on September 30, 1955, these actions were taken only after offers to purchase had been received and after negotiations had been conducted for the sale of the trust properties, including the sale of the "account receivable" charged against Community. Under these circumstances, we are of the opinion that any determination that the account was wholly worthless would have been contrary to the evident facts. Charge-offs cannot be treated as independent of the negotiations for sale of the account, and

the account could not be charged off as a business bad debt and be treated as a separate transaction without ignoring the fact that its sale was at that time arranged and the further fact that it was thereafter sold as an asset of the trust. Von Hoffman Corp. v. Commissioner of Internal Revenue, 8 Cir., 1958, 253 F.2d 828, 831; Mitchell v. Commissioner of Internal Revenue, 2 Cir., 1951, 187 F.2d 706, 707.

■ We have previously indicated our opinion that the evidence conclusively shows the trust advances were, in substance, contributions to the capital of Community and were therefore subject to tax treatment as capital assets. Though this evidence be disregarded and though taxpayers' theory that the advances were in the nature of loans or debts be adopted, it is equally as certain that the uncollectible amounts thereof were not charged off as business bad debts before, or independently of their sale, as is required by the applicable statutes. Under any interpretation of the facts, it is apparent upon the basis of undisputed and uncontroverted evidence that taxpayers are not entitled to claim their loss as a business bad-debt deduction. Therefore, the action of the District Court in directing a verdict in favor of the defendant and in dismissing the complaint will be

Affirmed.

---

mode prescribed for the charge-off of uncollectible debts and while the intent to so recognize worthlessness may be manifested in a number of ways, there would be some question, even if informal methods would suffice, where, as here, the taxpayer maintained a complete set of books and records upon which such a notation could have been made. Reed v. Commissioner of Internal Revenue, 4 Cir., 1942, 129 F.2d 908, 912.

7. While the conservator did recommend that the beneficiaries consider a charge-off of the account receivable and the sale

of the trust hotel properties at the July 22, 1955, meeting, his report to the court mentions only that counsel for the beneficiaries thereafter informed him of the approval of the sale. Moreover, the court order, based upon the report, stated only that "no *substantial* amount can be collected upon the indebtedness." (Emphasis supplied.) It should be noted that the conservator's report further stated that the purpose of the meeting with the beneficiaries was to discuss the offers for the purchase of the trust properties.