JEWELL RIDGE COAL CORPORATION,
Petitioner,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 8863.

United States Court of Appeals
Fourth Circuit.

Argued March 29, 1963.

Decided June 3, 1963.

Robert K. Eifler, Washington, D. C. (Seymour S. Mintz, and Hogan & Hartson, Washington, D. C., on brief), for petitioner.

Edward L. Rogers, Atty., Dept. of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, on brief), for respondent.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BRYAN, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

The Commissioner of Internal Revenue determined that the purchase by Jewell Ridge Coal Corporation of the outstanding indebtedness of the Oneida & Western Railroad Company, a majority of whose stock it simultaneously acquired, and Jewell's subsequent advances to the Railroad, constituted contributions to capital and not loans. With their deduction as bad debts disallowed on abandonment of the Railroad, an income tax deficiency for 1953 resulted. This assessment the Tax Court sustained. It also sustained the Commissioner's ruling that the loss of Jewell on the worthless stock did not occur in 1953 but in 1954, when the Railroad was liquidated.

■ As ultimate factual inferences refined from undisputed subsidiary findings and not clearly erroneous, the judgment of the Tax Court, on this petition of Jewell for review, must prevail. Commissioner v. Duberstein, 363 U.S. 278, 290–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Peebles v. Commissioner, 249 F.2d 92 (4 Cir., 1957). Even if taken as a legal resolution, the conclusion is sound. See Bogardus v. Commissioner, 302 U.S. 34, 38, 58 S.Ct. 61, 82 L.Ed. 32 (1937); Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 490, 57 S.Ct. 569, 81 L.Ed. 755 (1937); Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 79 L.Ed. 1343 (1935).

A miner of coal in Virginia, West Virginia and Kentucky, Jewell in 1945 was considering the development of coal fields in Tennessee, near Oneida and James-

town. Prospecting there, it found large acreages of first-rate mineable seams along the Oneida and Western Railroad. Successful working of these veins was already in progress, and only lack of initiative in the Railroad accounted for the absence of a more extensive winning and extraction of the deposits. In August 1946 Jewell resolved to open and lay out a colliery in the vicinity. The survey of the area led Jewell into the Railroad's history and financial status.

Oneida & Western, organized in 1912 by promoters of timber products, was 37 miles long, near the Cumberland River, and at one end connected with the Southern Railroad. The lumber industry had diminished substantially by 1937, and from then until 1942 the line had annual current deficits. Its road and equipment had an undepreciated value of about $800,000.00 but no funded debt. In February of that year Irving Crown, Michael S. Healy and James R. Healy acquired all of its capital stock. Crown conducted a building supply business, and the Healys were builders who had been awarded a contract by the United States for the erection of Wolf Creek Dam across the Cumberland. In this undertaking Crown would supply cement and other necessary materials and ship them to the site over the Railroad. The carrier thus would earn a handsome profit.

However, World War II postponed the Dam. Meanwhile, the Railroad with no increase in traffic was continued in a merely operable condition. An average loss of $20,000.00 each year was suffered, through most of 1946, advances to meet operations being made by Crown and an associate. The total indebtedness of the Railroad when it came under the eye of Jewell in that year was $127,322.10. The contract for the Dam was lost by the Healys when new bids were sought after the War. The Interstate Commerce Commission had been requested to authorize abandonment of the Road. Putting a value of $150,000 upon the Railroad unoperated, the Commission conditioned abandonment upon its owner's inability to obtain a purchaser at that figure.

In these circumstances Jewell closed negotiations with Crown and the Healys about September 1946 in a single transaction embracing: (1) the sale to Jewell at $17,500 of 6,000 acres of coal reserves bounding the Railroad and belonging to Crown and the Healys, (2) assignment to Jewell of the Railroad's entire indebtedness (notes and open account, all held by Crown and the Healys) in the face amount of $127,322.10, and (3) the entire existing Railroad stock—7,500 shares—for $5,177.90. The total was $150,000, the equivalent of the defunct value of the Railroad. Actually, only 5,000 of the shares were for Jewell. Its president, St. Clair, with his family, received 1,350, the remainder of the stock going to others not here involved.

Before consummating the deal, Jewell had good reason to consider the fair value of the Railroad as a live concern to be between $400,000.00 and $500,000.00. Earnings just then slightly exceeded operating costs, taxes and other expenses, including depreciation but not interest. There was cause to believe that the depreciation allowance of $7,000.00 would be available each year for application to the debt. Larger net revenues were anticipated during the next two years from the building of the Dam and operation of Jewell's proposed mine. Aside from the depreciation allowance, the revenue estimates were $75,000.00 for the first two or three years and thereafter approximately $50,000.00 per annum—ample to retire the Railroad's debts.

Foreseeable, $37,500.00 was immediately required for the repair of a bridge and provision of working capital. Jewell through a local bank advanced this sum to the Railroad. For the next 18 months or more the Railroad showed a profit, and in 1948 appreciably curtailed the indebtedness. However, unforeseeable events turned the Railroad into an unprofitable enterprise: bridge repairs far exceeded the original approximation; calls for cement were delayed with the demand stretched over a period of four instead of the initially planned two

years; and the Cumberland flood in the 1947-48 winter, and a labor strike in 1949, both prolonged the work on the Dam. Besides, the Jewell coal mine, with an expected minimum daily output of 2,000 tons, closed down in 1949, six months after starting—its roofing support had collapsed. Advances of $36,000 were made the Railroad by Jewell from February to April, 1947 for the increased bridge expense and to offset the disappointing car loadings, and $5,000 in 1948 and $5,000 in 1949 to satisfy State taxes.

After shutting up its mine in 1949, Jewell turned to the Railroad, looking especially for other probable sources of freight movement. There were several possibilities, including a steel mill contemplated by one of Jewell's principal stockholders. These Jewell thought justified further advances to the Railroad to keep it alive and to protect its money then in the Railroad, whether on credit or in capital. By December 21, 1953 the Railroad on its books owed Jewell $384,025.60.

All this indebtedness was evidenced by open accounts or demand notes at 3%, carried on Jewell's books as debts receivable. Interest was not accrued or demanded and, indeed, not expected before repayment of the principal. Corresponding entries were made on the accounts of the Railroad, with the approval of the Interstate Commerce Commission.

In July 1952 or shortly thereafter, Jewell was convinced that the Railroad could not support itself. But its disposition save as scrap was not to be achieved readily. So, in February 1953 Jewell asked the Commission, with the acquiescence of the other Railroad shareholders, to permit discontinuance of the Oneida & Western. That was accomplished in January 1954. During this proceeding, Jewell assumed all wages, taxes and incidental accounts of the Railroad, advancing some $48,000.00. Included was the cost of maintaining a skeleton operation. The book debt total of $384,025.60 did not include interest. Of this, $231,666.60 was charged off on

December 31, 1953 as worthless. This figure was reached by deducting from the principal book indebtedness the sum of $152,359.00, the amount anticipated from the sale of the dormant Railroad.

Actually, the sale brought more, and from the proceeds all obligations (except any return due Jewell) of the Railroad and expenses of sale were paid, leaving a balance of $159,330.18. This was applied to the Jewell claims.

With the outlays made by Jewell assigned by the Commissioner to capital, the debt of $384,025.60 was added to the cost allotted by Jewell to its Railroad stock—that is $3,452.90 for the first 5,000 shares and later $4,400.00 for 200 more shares, a sum of $7,852.90—making a total cost of $391,878.50. The consequent loss, after deduction of the net proceeds of sale, was not allowed until 1954 because then only was it determinable.

I. The ruling disallowing the charge-off of $231,666.60, just mentioned and as already explained, is the first ground of this suit.

The Tax Court condensed its conception of the Jewell-Railroad transaction this way:

" * * * The record herein indicates to us that in reality the crux of the bargain was that the former owners of O. & W. were to get and petitioner was to pay the approximate salvage value of the railroad. The method by which this was accomplished was the purchase of certain coal land for $17,500 and the payment of $132,500 for the railroad. The latter transaction was cast in the form of the purchase of $127,322.10 of O. & W.'s indebtedness and the payment of $5,177.90 ($132,500 minus $127,322.10) for its stock. We consider that in practical reality petitioner acquired the railroad by paying to or on behalf of its owners a total amount of $132,500, and in reality this sum represented petitioner's original cost of the railroad. * * * "

The nature of the advances, whether loans or capital, is an ascertainment of fact, with the burden on the taxpayer to establish his assertion of "loans". Gilbert v. Commissioner, 262 F.2d 512, 513 (2 Cir.), cert. denied, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959). The distinction between "stockholder", that is, one who pays money into the corporation as a contributor to capital, and a "creditor", one who lends money to the corporation, was stated by this Court in Helvering v. Richmond, F. & P. R. Co., 90 F.2d 971, 974 (1937) thus:

"The essential difference between a 'stockholder' and a 'creditor' is that the stockholder intends to embark upon the corporate adventure, taking the risks of loss attendant upon it that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided but merely to lend his capital to others who do intend to take them."

The standards for making the distinction were repeated by us in Wachovia Bank & Trust Company v. United States, 288 F.2d 750, 755 (4 Cir., 1961). Principally, as Judge Boreman noted, the referable criteria are: the relationship of the stock-owners of the sponsored corporation with those of the sponsoring corporation; the visitation of the former concern by the latter; comparison of the money supplied to, and the paid-in capital of, the kept corporation; the incidents of the obligations, such as the dates of maturity, the insistence upon payment of principal or interest and the security, if any; and expectation of repayment. See, too, Ortmayer v. Commissioner, 265 F.2d 848, 852 (7 Cir., 1959). Presently, in our judgment, the Tax Court was quite mindful of these indicia.

True, Jewell was the owner of only two-thirds of the outstanding capital stock. But the remainder was owned in large measure by persons closely tied to Jewell. St. Clair, his two sisters and their families had a majority of the

Jewell stock. The Railroad had outstanding 7,500 shares. Jewell first held 5,000, then 5,200, and St. Clair, its president, and his family acquired 1,350. This, we think, established a striking identity between Jewell and the Railroad. Surely, it deflates Jewell's emphasis upon the independence of the Railroad. In this, Jewell pressed that the Railroad's assets or franchises were not bought—that the Railroad remained an unabsorbed, separate entity entirely competent as a debtor of Jewell. Further merging the identity of Jewell with the Railroad was the participation of St. Clair in the control of the Railroad as chairman of its Board of Directors.

Even assuming the original obligation of $127,322.10 was a *debt* owing to Crown and the Healys—and this may be questioned for they were then the sole stockholders, with the bulk of their claim arising in much the same manner as Jewell's—it could readily be converted into capital in the Jewell acquisition. That would be the result, though unintended by Jewell, if the circumstances of the assumption by Jewell of the claim against the Railroad constituted in fact a capital investment. This, indeed, was the conclusion of the Commissioner and the Tax Court.

The vast disproportion of the amount concededly paid by Jewell as capital—the stock purchase from Crown and Healy, 7,500 shares for $5,177.90—and the alleged loan of $127,322.10 and the subsequent $256,703.58, totalling $384,025.60, renders these amounts suspect as loans. While Jewell and its officers are altogether innocent of even intimation of any misdoing or ulterior motive, the relationship of the financier to the financed objectively throws doubt upon these funds as loans. The patron, when it is the majority holder of the receiving corporation, has a heavy burden to prove its help was a loan. That was held, albeit in altogether different background but nonetheless identically in principle, in Pepper v. Litton, 308 U.S. 295 at 306, 60 S.Ct. 238 at 245, 84 L.Ed. 281 (1939). At p. 309 of 308 U.S., at p. 246 of 60 S.Ct., at p. 281 of 84 L.Ed. the Court added:

" * * * And so-called loans or advances by the dominant or controlling stockholder will be subordinated to claims of other creditors and thus treated in effect as capital contributions by the stockholder * * * where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder as a loan."

The other salient features which the Tax Court believed gave each advancement the countenance of capital, rather than the face of a borrow, are these: (1) that no interest was ever paid, but in truth was expressly deferred— scarcely the attitude of a money lender; (2) that the Railroad historically was a losing proposition—hardly an attractive, bankable loan, certainly not at 3%; (3) that the future success of the Railroad was the only prospect for repayment of the moneys; and (4) that, with no immediate ability to pay, the Railroad was nevertheless given the money without security whatever, save for a $15,000 lien on two locomotives.

The Tax Court obviously concluded that the Railroad moneys were one with the expenditures in the coal hunt. All were made in good faith, but the whole was risk capital. We are not at liberty to say the facts were insufficient to persuade the Tax Court as they did. At least the taxpayer has not proved the contrary, and that was its burden. Gilbert v. Commissioner, supra, 262 F.2d 512, 513.

II. The correctness of the disallowance by the Tax Court in 1953, rather than in 1954, of the amount claimed by Jewell as a deduction for the worthless stock of the Railroad appears from the chronicle of the facts. It needs no further justification.

Redetermination was properly denied by the Tax Court.

Affirmed.