Robert W. Bradshaw, Jr., Fleming, Robinson & Bradshaw, Charlotte, N. C., for plaintiff.

Johnnie M. Walters, Asst. Atty. Gen., Sidney B. Williams, Atty. U. S. Department of Justice, Washington, D. C., and Joseph R. Cruciani, Asst. U. S. Atty., Charlotte, N. C., for defendant.

**RAM CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 2220.**

United States District Court
W. D. North Carolina,
Charlotte Division.

Oct. 3, 1969.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

### PRELIMINARY STATEMENT

Ram Corporation, the plaintiff, paid $22,500 to its "debenture" holders in the taxable year 1962. Under protest, it paid income taxes for the year 1962 without a deduction from income of the $22,500 thus paid. Ram has now brought suit to recover the alleged overpayment, §10,845.28, plus interest, upon the theory that the $22,500 was deductible as " * * * interest paid * * * on indebtedness" under 26 U.S.C.A., § 163(a). From the stipulations and the evidence the court makes the following

### FINDINGS OF FACT

1. In 1957, Mrs. Richard A. Myers owned several tracts of land in Charlotte,

---

1. United States v. Beltran, 306 F.Supp. 385, Cr.No. 42330, N.D.Cal., 7/11/69; United States v. DeMarco, Cr.No. 42377, N.D.Cal. 7/30/69.

Mecklenburg County, North Carolina, which lay along the east and the west sides of Baldwin Circle (now Kings Drive) between Independence Boulevard to the north and Morehead Street to the south. Other members of her family and other family corporations owned other nearby land. Her son Brevard S. Myers of Charlotte and her son John S. Myers of Columbia, South Carolina, were two of those owners. She had five grandchildren, sons of Brevard and John Myers. She was in her late sixties and in apparent good health, and was of sufficient financial independence that she spent several months a year traveling away from her home in Charlotte.

2. Over a period of years Mrs. Myers and her family, directly and through family owned corporations or trusts, had developed land along Baldwin Circle by arranging lease contracts with prospective tenants and then erecting buildings of roughly 3,000 to 5,000 square feet area, for lease to tenants on lease terms of ten years minimum duration. The construction of the buildings was usually done by Myers and Chapman Construction Company, of which Brevard S. Myers was vice president.

3. In 1957 Ram Corporation, the plaintiff, was organized by Mrs. Myers under North Carolina law. She transferred to the corporation $12.00 in cash plus land lying along Baldwin Circle having a 1957 appraised value of $139,988.00. The adjusted tax basis of Mrs. Myers in the land at that time was $10,857.26. In exchange for the land plus the $12.00, the corporation issued to Mrs. Myers ten shares of $100.00 par value common stock valued at $1,000.00; five hundred shares of $100.00 par value preferred stock valued at $50,000.00; and "Series A Debentures" bearing interest at 5% in total face amounts of $89,000.00. John S. Myers was president of the corporation. Brevard S. Myers was vice president and was the managing officer of the corporation and the person who handled the organization details.

4. Purposes served in organizing the corporation included: (a) providing a convenient vehicle for transferring property (and possible income from the property) in equal amounts to five grandchildren; (b) establishing a fixed value for the gifts to these grandchildren and thus avoiding annual re-evaluation; (c) setting up an organized corporate control or management in the hands of Brevard S. Myers, and experienced builder and real estate operator, and relieving Mrs. Myers of managerial responsibility; and (d) avoiding corporate income taxes to the extent of the interest paid on the debentures if the debentures stood up as a method to accomplish that purpose.

5. After forming the corporation Mrs. Myers in 1957, 1958 and 1959 transferred to her five grandchildren, in units of $3,000.00 per child per year, debentures of a total face value of $45,000.00. Mrs. Myers died in 1960. At the time of her death she owned all the $50,000.00 of preferred stock, all the $1,000.00 of common stock, and all the remaining $44,000.00 worth of Series A debentures.

6. None of the debentures had been retired or redeemed on February 10, 1969, the date of the trial.

7. At the time of incorporation in 1957, Ram Corporation was not a "going concern." It had no flow of cash and no prospect for any cash flow except such as might be developed by selling or renting land or by building new buildings for lease or rent.

8. The first business venture of the corporation was the construction of three triplexes or dwelling units which was completed in 1958. This was followed by the completion of three more triplexes in 1959. These triplexes did not produce enough money to pay any interest on the debentures.

9. No commercial or industrial property has ever been constructed by Ram Corporation on any of the land originally transferred to the corporation in 1957. (However, a 4,000 square foot

building has been built in 1969 in a different community several blocks away on Morehead Street on some land later purchased by Ram corporation with proceeds from the sale of a portion of the original land.)

10. Between 1957 and 1961 Brevard S. Myers, vice president of Ram, attempted to negotiate leases of buildings to be built on various portions of the Kings Drive-Baldwin Circle property, including property owned by Ram and other property owned by members of the Myers family. None of these efforts was successful as far as Ram was concerned.

11. Between 1957 and 1961 the market value of taxpayer's property was increasing rapidly and predictably.

12. No interest was paid on any of the debentures until October 31, 1962, when the debentures were about five years old. At that time, a prospective purchaser of a portion of the land allowed an option to lapse; the sum of $42,700 became available from that source; and interest was paid in the amount of $22,500, covering the five years from 1957 to 1962. This payment, the occasion for this suit, was made in October, 1962.

13. No more payments of interest were made until 1964. In 1964 the Ram property east of Baldwin Circle, roughly 800 feet by 150 feet in average dimensions, was sold to a promoter for about $400,000, which is roughly $500 a front foot and is nearly forty times the taxpayer's base in *all* the Ram property! Since that time, annual interest of $4,450 on the debentures has been paid out of interest received from investment of the $400,000.

14. The original stated plan and intention of the taxpayer was to build small business buildings and lease them for terms of at least ten years. This method had been used successfully by the family before 1957. However, the construction of Charlottetown Mall and the opening of Kings Drive should have made it obvious by 1957 that the land was getting too valuable for small buildings and that the chief asset and source of income for Ram was not the *development* and lease of *small* buildings but the *sale* of the land to people who wanted to build *big* buildings.

15. A copy of one of the debentures is attached as Exhibit A to this judgment. Taking the text of the debenture and considering it against the background of the family and the real estate and the community history shown in the evidence, the following facts are apparent:

(a) The debenture term is twenty years—a fairly long time;

(b) The debentures are subordinated to all other corporate obligations except obligations to stockholders;

(c) No dividends to any stockholders were supposed to be paid until all the debentures were paid off in full (the taxpayer ignored this restriction by paying preferred dividends in 1966, 1967 and 1968);

(d) One individual—Mrs. Myers—held all the common stock, all the preferred stock, and all the debentures;

(e) The entire transaction was a family affair;

(f) No provision whatever was made for the retirement of the debentures through a sinking fund or otherwise;

(g) No source of money was provided to pay the annual interest on the debentures;

(h) No payment of interest was made for a period of five years; the debenture holders did not complain;

(i) The provision prohibiting dividends on preferred or common stock until the debentures were paid in full has been ignored by the taxpayer and the debenture holders; dividends were paid on preferred stock in 1966, 1967 and 1968, even though the debentures had not been retired;

(j) There was no provision for acceleration of payment in the event of

a default in the annual interest payment;

(k) No penalty for nonpayment or late payment of interest was provided;

(l) No security whatever was provided for the debentures;

(m) The "hoped-for" source of income to pay the interest was a source which by the time the debentures were issued was already demonstrably unreliable. The habit and tradition of family real estate development had contemplated building small buildings and renting them on long terms for small business use. Charlottetown Mall, a large covered air-conditioned shopping center, had been a gleam in its builder's eye for several years before Ram Corporation was formed, and it was known in 1957 that it would be built on land immediately north of the taxpayer's land. The predictable impact of that development and other development in the area was such as to inflate land values tremendously. The family tradition of small, one story office buildings could no longer reasonably be expected to succeed in this situation. With Charlottetown Mall going up next door, this turn of events was predictable when Ram Corporation was formed. The contention of the plaintiff that the business plans for the property contemplated an income source of money to pay interest and retire the debentures is unrealistic; the only really likely source of money to pay interest was sale of the property.

## CONCLUSIONS OF LAW

All findings of fact herein are deemed conclusions of law and all conclusions of law are deemed findings of fact to the extent that this will tend to support the judgment herein made. All the evidence in the record has been considered in reaching these findings and conclusions.

The "debentures" did not give rise to the payment of anything which should fairly be considered as an "indebtedness" within the meaning of the Internal Revenue Code. No knowledgeable investor would have let money on the strength of promises of the shaky nature and indefinite character contained in them. Every legitimate business purpose which can be imagined for the corporation could have been fully served without the debentures. The only purpose the debentures served which could not also have been served without them is to minimize corporate income taxes. Although concededly valid contracts between the parties, they do not qualify as "indebtedness" for tax purposes; they created for tax purposes not a debt but an equity; the payments labeled "interest" were return of capital rather than income and therefore were not deductible by the corporate taxpayer. United States v. Snyder Bros. Co., 367 F.2d 980 (5th Cir., 1966); Jewell Ridge Coal Corporation v. Commissioner of Internal Revenue, 318 F.2d 695 (4th Cir., 1963); P. M. Finance Corporation v. Commissioner of Internal Revenue, 302 F.2d 786 (3rd Cir., 1962); see Wachovia Bank & Trust Co. v. United States, 288 F.2d 750 (4th Cir., 1961); and Talbot Mills v. Commissioner of Internal Revenue, 326 U.S. 521, 66 S.Ct. 299, 90 L.Ed. 278 (1946).

It is argued for the taxpayer that the debt-equity ratio is reasonable; that minimizing taxes is a legitimate purpose; that the parties considered the transaction to create a debt; that the debentures follow the style and language of debentures in another corporation owned by the family; that the existence of subordination provisions is not controlling; and that what the parties called the transaction to be should be given great weight in the decision.

No doubt there is something to be said for all of those contentions. Tax avoidance is still a lawful motive of the managers of money. Nevertheless, even if we look only to the terms of the debentures themselves, we find such an unsecured and indefinite promise that no ordinary business lender would have invested in them; courts have held pay-

ments under such instruments to be non-deductible even where the "interest" was in fact paid on schedule, United States v. Snyder, *supra*. Moreover, when we look at how the parties actually treated these contracts, as opposed to what they call them and want their tax effect to be, the conclusion is overwhelming that whatever they were called, they have never been treated as business debts. Interest has never been paid out of operating income; dividends on preferred stock have been paid before paying the debentures; no provision has yet been made for retirement of the debentures; and no interest has ever been paid except out of a dividend in the form of proceeds of the lapse of an option and the proceeds from the sale of a part of the land. What the parties have done speaks far louder than what they say. The court is of the opinion and finds that the debentures did not really create an "indebtedness" in the eyes of the tax laws, and that the "interest" is not interest and that its payment is not deductible by the taxpayer.

## ORDER

It is, therefore, ordered, that the plaintiff recover nothing of the defendant, and that this action be dismissed, with costs to be taxed against the plaintiff.

## EXHIBIT A

No. 1                                $1,000.00

### DEBENTURE—SERIES A.

### MYERS & CHAPMAN, INC.

*****

FOR VALUE RECEIVED, Myers & Chapman, Inc. (hereinafter referred to as the corporation), a North Carolina corporation, promises to pay to the registered owner of this Debenture One Thousand ($1,000.00) Dollars ten (10) years from the date hereof, together with interest from the date hereof at the rate of six (6%) per cent per annum, payable semi-annually on the first days of May and November hereafter, sub-

ject to the subordination provisions hereinafter set forth.

This Debenture is registered on the books of the corporation and is transferable only on the books of the corporation. The corporation shall at all times, regardless of any notice it may have or be deemed to have to the contrary, have the right to treat as the sole owner hereof that person who is registered upon its books as the owner.

This Debenture is payable at any time before maturity at the option of the corporation. If the corporation elects to pay this Debenture before maturity, it shall select a redemption date and shall give thirty (30) days' written notice of this redemption date, mailed to the registered owner as his address may appear upon the books of the corporation. Upon surrender of this Debenture on or after said redemption date, the corporation shall pay to the registered owner One Thousand ($1,000.00) Dollars and any interest which may have accrued between the date of the last semi-annual payment of interest by the corporation and the redemption date. From and after the redemption date, notice of which has been duly given as set forth above, no interest shall accrue on this Debenture; provided, however, that if after due notice of a redemption date has been given as set forth above and after this Debenture has been presented for payment as set forth above, the Corporation shall fail or refuse to pay the Debenture, interest at six (6%) per cent per annum, payable semi-annually on the 1st days of May and November, shall continue to accrue until this obligation is paid or until funds sufficient to pay it are set aside in trust and notice of said funds in trust is given by mail to the registered owner at his address as it may appear upon the corporate books.

The obligation represented by this Debenture is subordinate to all other obligations of the corporation except obligations to stockholders accruing to them upon their stock. Without limiting the generality of the foregoing, it is expressly provided that in the event of the

dissolution or liquidation of the corporation, all of its debts, obligations and liabilities, except its obligations to its stockholders accruing to them upon their stock, shall be discharged in preference and priority to this Debenture.

Nothing contained in the preceding paragraph shall prevent the payment of this Debenture when the same comes due or is called for redemption if at the time of such payment the corporation retains what the directors then in good faith deem to be sufficient assets to pay all other debts and obligations of the corporation, except obligations to stockholders accruing to them upon their stock, and except obligations upon other Debentures of this Series A.

IN TESTIMONY WHEREOF, Myers & Chapman, Inc., has caused this instrument to be executed in its corporate name by its President and attested by its Secretary, and has caused its corporate seal to be hereunto affixed, all by authority duly given.

Date of this Debenture: November 1, 1953

(Duly attested).