LOUIS P. De PASQUALE and JIMMIE ANN De PASQUALE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Pasquale v. Commissioner
Docket No. 4080-73.
United States Tax Court
T.C. Memo 1975-196; 1975 Tax Ct. Memo LEXIS 173; 34 T.C.M. (CCH) 841; T.C.M. (RIA) 750196; June 23, 1975, Filed Leonard Bailin, for the petitioners. Michael A. Menillo, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Taxable Year
Deficiency
1967
$ 2,815.00
1968
44,017.00
1970
3,406.49
The issues to be decided are as follows: 1. Whether certain advances made by petitioners to two corporations were loans or contributions to capital. 2. If the advances were loans, did they create business debts or nonbusiness debts within the meaning of section 166? [1]/ 3. Whether petitioners are entitled to capital *174 gain treatment of the gains derived from the sale of corporate stock in 1968. FINDINGS OF FACT Petitioners Louis P. De Pasquale and Jimmie Ann De Pasquale were legal residents of Southampton, New York, at the time their petition was filed. They filed joint Federal income tax returns for 1967, 1968, and 1970, with the District Director of Internal Revenue, Brooklyn, New York. Petitioner Louis P. De Pasquale (hereinafter referred to as De Pasquale) worked as a stagehand in the Metropolitan Opera House in New York City for several years prior to 1964. In 1964, he became a shareholder in Staging Techniques (hereinafter referred to as Techniques), which supplied equipment for industrial shows and productions. At that time, he advanced $10,000 in cash and guaranteed debts owed by Techniques in the amount of $10,000. When De Pasquale acquired his interest in Techniques, the corporation was in financial trouble. Techniques had insufficient working capital to carry its accounts receivable. Due to De Pasquale's activities, Technique's financial situation had improved significantly by 1967. In 1968, De Pasquale and Ray Hayes incorporated Stage Right Organization (hereinafter referred *175 to as Stage) and each advanced $10,000 as capital contributions. Stage was to engage in the business of producing industrial shows. Because the original contribution of $20,000 was insufficient to meet Stage's capital needs, De Pasquale advanced other funds to Stage as needed. In 1968, Bell Television, Inc. (hereinafter Bell) acquired De Pasquale's interests in Stage and Techniques in exchange for 75,000 shares of Bell stock. De Pasquale then accepted employment with Bell at an annual salary of $50,000. While an employee of Bell, De Pasquale's duties included the investigation of businesses for possible acquisition by Bell. Although Bell accepted some of his recommendations, he did not personally acquire and promote any corporation while an employee of Bell. In 1968, De Pasquale sold 15,750 shares of Bell stock, thereby realizing a gain of $210,541. This gain was reported as capital gain on petitioners' Federal income tax return for 1968. Sometime in 1969 or 1970, De Pasquale terminated his employment with Bell and, together with two other investors, reacquired Stage's stock from Bell. At that time he advanced $10,000 to Stage and guaranteed notes owed by Stage to Bell in the *176 amount of $20,000. During 1969 and 1970, De Pasquale issued checks to Stage in the total amount of $20,000. These advances were necessary to enable Stage to maintain shows in production prior to receiving fees from its clients. Stage returned at least $10,000 of these advances to De Pasquale. In 1970, De Pasquale organized Visual Environments, Inc. (Environments), which was to perform the same functions as had Techniques, i.e., supplying equipment to production companies. He contributed $5,000 to $10,000 to the capital of Environments and guaranteed certain loans to enable it to commence operations. Later in 1970, Environments was merged into a shell corporation, Chemovive Processing, which changed its name back to Visual Environments (hereinafter Visual). At this time Visual acquired all of Stage's stock. Following the merger, De Pasquale owned approximately 48 percent of Visual's stock and the public owned approximately 30 percent. During this period, De Pasquale guaranteed two notes in the amounts of $40,000 and $35,000, owed by Visual to the First National City Bank. These notes were renewed each month on a continual basis. The guarantee was "open," so that De Pasquale was *177 also liable for any of Visual's overdrafts in addition to the $75,000 loan. The bank had required this guarantee as a prerequisite for the loan. As collateral, De Pasquale pledged a $75,000 certificate of deposit already in the bank. As the year 1970 progressed, Stage and Visual encountered financial difficulties. First National City Bank demanded payment of the loans it had made to Visual and took possession of the $75,000 certificate of deposit. In addition, as a result of an overdraft by Visual, the bank charged $13,420.54 against De Pasquale's personal checking account. Both corporations filed petitions under chapter XI of the Bankruptcy Act. Stage and Visual were adjudicated bankrupt on December 1, 1970, and July 29, 1971, respectively. De Pasquale received nothing from the two corporations. Shortly after the chapter XI petitions were filed but prior to the adjudication, De Pasquale personally paid the salaries of Stage's employees, amounting to $5,613.20, and advanced additional cash in the amount of $7,630.33. The total amount advanced or paid by De Pasquale on behalf of Visual and Stage was $113,330.07. The corporations gave him no notes and agreed to no fixed maturity *178 date or repayment schedule, and De Pasquale demanded no interest with respect to any of the advances. On their Federal income tax return for 1970, petitioners deducted the total of De Pasquale's advances, $113,330.07, as worthless business debts. This deduction created a net operating loss for which petitioners were allowed a tentative carryback adjustment to 1967 and 1968. Respondent disallowed the deductions and determined the disputed deficiencies. OPINION The crucial issue is the tax character of the advances De Pasquale made to Visual and Stage. Petitioners claim deductions in the amount of the advances under section 166, [2]/ contending that the advances created business debts which became worthless in 1970. Respondent does not deny that the advances were made but argues that the disputed advances constituted capital contributions to the two corporations. Alternatively, respondent argues that if bona fide debts arose as a result of the transactions between De Pasquale and the corporations, they were nonbusiness rather than business debts. *179 We hold for respondent, basing our conclusion on the ground that De Pasquale has not shown that his advances to Visual and Stage created business debts. [3]/ *180 A worthless debt is allowable as a bad debt deduction under section 166 only if the debt bears a proximate relationship to the taxpayer's trade or business. Whipple v. Commissioner,373 U.S. 193, 201 (1963); sec. 1.166-5(b), Income Tax Regs. We do not find any proximate relationship between the disputed advances and any trade or business in which De Pasquale was engaged. Visual and Stage were engaged in the business of supplying and producing industrial shows, respectively. De Pasquale owned stock in those corporations and held an executive position with them. A multiplicity of cases have held that the business of a corporation, a separate taxable entity, is not the business of the shareholder. See, e.g., Wheeler v. Commissioner,241 F.2d 883 (2d Cir. 1957), affg. a Memorandum Opinion of this Court; Commissioner v. Schaefer,240 F.2d 381 (2d Cir. 1957), revg. and remanding 24 T.C. 638 (1955). Thus, the disputed advances do not qualify as business loans merely because De Pasquale was active or interested in the business of the corporations in which he had invested. Phil L. Hudson,31 T.C. 574 (1958); *181 Whipple v. Commissioner,supra at 202. Petitioners, not disputing the latter rule, earnestly contend, however, that De Pasquale was in the trade or business of organizing or acquiring, promoting, and selling corporations. In support of the contention, petitioners point to De Pasquale's early involvement with Stage and Techniques, the sale of those two corporations to Bell, his promotional activities while at Bell, and his involvement with Stage and Visual in 1969 and 1970. A continuous pattern of promoting, financing, and organizing corporations for resale or for a fee may constitute a trade or business for purposes of section 166. See Henry E. Sage,15 T.C. 299 (1950); Giblin v. Commissioner,227 F.2d 692 (5th Cir. 1955), revg. a Memorandum Opinion of this Court. Cf. Phil L. Hudson,supra;Whipple v. Commissioner,supra at 202. However, there is neither sufficient continuity nor intensity of such activity on De Pasquale's part to permit a finding that he was engaged in such activities as a trade or business. The record provides only meager evidence of any promotional activities. *182 During 1964 to 1968, De Pasquale organized two corporations, Stage and Techniques, which he later sold to Bell. Thereafter, he conducted corporate acquisition work as an employee of Bell, not on his own behalf. When he left Bell, he continued his long-term association with Stage, and organized Visual to perform the functions of Techniques. Throughout the period 1964 through 1970, De Pasquale made only tentative and unsuccessful efforts (apart from the one sale to Bell) to dispose of his corporations. His association with them as an investor continued until the very end, even to the extent of his advancing cash to Visual after the chapter XI petition had been filed. The only realistic inference from the evidence is that De Pasquale's activities were those of a long-term investor in a specific type of enterprise, i.e., industrial show production. His advances were designed initially to maintain the corporations, and later to salvage his longterm investment. Certainly the sale of the two corporations in 1968 does not constitute a trade or business of organizing, promoting, and selling corporations. Petitioners are, therefore, entitled only to short-term capital loss deductions in the *183 years during which the debts became worthless. [4]/ Similar treatment must be accorded the losses attributable to the guarantees. See Stratmore v. United States,420 F.2d 461 (3d Cir. 1970), cert. denied 398 U.S. 951 (1970); United States v. Hoffman,423 F.2d 1217 (9th Cir. 1970). Decision will be entered for the respondent.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. / SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- * * *
(B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.-- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. / Our conclusion that petitioners are not entitled to the claimed bad debt deduction under sec. 166 might be rested on petitioners' failure to prove that the transactions were not, in substance, capital contributions. Matthiessen v. Commissioner,194 F.2d 659 (2d Cir. 1952), affg. 16 T.C. 781 (1951); Motel Corp.,54 T.C. 1433, 1436 (1970). In this connection, De Pasquale owned 48 percent of Visual's stock. There was no fixed maturity date for repayment of the advances; no interest was payable on the advances; no repayment schedule was adopted. The advances were made in the early stages of corporate life in order to initiate business operations. The corporations were undercapitalized from the beginning, and they were heavily dependent upon De Pasquale's advances to maintain their activities. See Schine Chain Theatres, Inc. v. Commissioner,331 F.2d 849 (2d Cir. 1964), affg. per curiam a Memorandum Opinion of this Court; Wachovia Bank and Trust Co. v. United States,288 F.2d 750, 756 (4th Cir. 1961); American-La France-Foamite Corp. v. Commissioner,284 F.2d 723, 725 (2d Cir. 1960), affg. a Memorandum Opinion of this Court, cert. denied 365 U.S. 881 (1961). Moreover, a significant portion of the advances were made when the corporations were experiencing the financial difficulties which eventually led to their bankruptcy. Such advances by a shareholder could not be made with the genuine expectation of repayment which is the hallmark of bona fide indebtedness. See Gilbert v. Commissioner,248 F.2d 399↩ (2d Cir. 1957), remanding a Memorandum Opinion of this Court. However, since this ground for denial of the deduction requires a recharacterization of the loans, we base our decision on the ground that the advances and guarantees created nonbusiness debts.
4. / Respondent questions the choice of 1970 as the year of worthlessness only if we hold that the advances were business losses. In view of our holding that the loans were not business related, we accept respondent's apparent concession as to the year of worthlessness. Since we have held that De Pasquale was not in a trade or business, we need not consider respondent's alternative contention that, if De Pasquale was in the business of organizing, promoting, and selling corporations, he realized ordinary income on the sale of his Bell stock.↩