ALFRED R. AND ANN L. GOLDSTEIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BARBARA L. GOLDSMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Goldstein v. Commissioner
Docket Nos. 11158-77, 11170-77.[1]
United States Tax Court
T.C. Memo 1980-273; 1980 Tax Ct. Memo LEXIS 310; 40 T.C.M. (CCH) 752; T.C.M. (RIA) 80273; July 28, 1980, Filed Hirschell E. Levine,Lawrence S. Albert, for the petitioners. Barry C. Feldman,Vincent R. Barrella, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in income tax as follows: (Petitioners)
Year
Deficiency
Alfred R. and Ann L. Goldstein
1972
$30,798
(Docket No. 11158-77)
Barbara L. Goldsmith
1972
33,039
(Docket No. 11170-77)
The sole issue for decision is whether interest-free "loans" made to trusts created for the benefit of petitioners' children were bona fide debts for purposes of section 166(d). [2]
FINDINGS OF FACT Some *311 of the facts have been stipulated by the parties and are found accordingly. Alfred R. Goldstein ("Alfred") and Ann L. Goldstein ("Ann") resided in Mamaroneck, New York, when they filed their petition in this case. Barbara L. Goldsmith ("Barbara") resided in New York, New York when she filed her petition in this case. Ann and Barbara are sisters and will be referred to collectively as "petitioners." For numerous years petitioners have owned, singly and in partnership, real estate investments. In 1969 Alfred acquainted petitioners and their father, Joseph I. Lubin ("Joseph"), with an apartment house located in New York City known as Schwab House. Petitioners felt Schwab House was a good investment and decided to create trusts for their children to invest in the property with Alfred and Joseph. On March 27, 1969, Barbara created three trusts (the "Goldsmith Trusts"), one for the benefit of each of her three children, John, Alice and Andrew. On the same day, Ann created three trusts (the "Goldstein Trusts"), one for the benefit of each of her three children, Richard, Wendy and Steven. Barbara and her then husband, C. Gerald Goldsmith, were the initial trustees of the Goldsmith *312 Trusts. On April 27, 1971, C. Gerald Goldsmith withdrew as trustee of the Goldsmith Trusts and was replaced by petitioner's mother who also later resigned prior to the dissolution of the trusts. The trustees of the Goldstein Trusts were Alfred and Ann. On or about March 27, 1969, Barbara transferred $20,000 to each of the Goldsmith Trusts as a gift. On or about March 28, 1969, Ann transferred $20,000 to each of the Goldstein Trusts as a gift. Both petitioners filed United States Gift Tax Returns for the calendar year 1969 with respect to these gifts. Petitioners made these gifts based in part on their understanding that they would not incur any gift tax on them. On March 31, 1969, each petitioner loaned $300,000 to each trust created by her. In exchange for these transfers each petitioner received demand promissory notes from each trust signed by the trustees. Petitioners and the trusts never executed any written loan agreements. The promissory notes were non-interest bearing, not secured by a mortgage, not guaranteed by any third parties and had no regular schedule for repayment. Petitioners did not intend to give their children's trusts $300,000 each or in any way permanently *313 part with that amount of money. The personal books and records of both petitioners consistently reflected these notes as loans. The trusts used the borrowed funds to invest in Schwab House through Alger Associates ("Alger"), a partnership having as its partners Joseph, Alfred and the trustees acting in their representative capacities. The ownership interest and capital contribution of the Alger partners was as follows: Partner
Ownership Interest
Contributed Capital
Joseph I. Lubin A
50%
$ 3,800,000.00
Alfred R. Goldstein
25%
1,900,000.00
Barbara and C. Gerald
Goldsmith, as
trustees F/B/O John
J. Goldsmith B
4-1/6%
316,666.66
Barbara and C. Gerald
Goldsmith, as
trustees F/B/O Alice
C. Goldsmith B
4-1/6%
316,666.67
Barbara and C. Gerald
Goldsmith, as
trustees F/B/O Andrew
L. Goldsmith B
4-1/6%
316,666.67
Alfred R. and Ann Goldstein,
as trustees
F/B/O Richard E.
Goldstein
4-1/6%
316,666.67
Alfred R. and Ann Goldstein,
as trustees
F/B/o w/endy H. Goldstein
4-1/6%
316,666.67
Alfred R. and Ann Goldstein,
as trustees
F/B/O Steven R. Goldstein
4-1/6%
316,666.66
Total
100%
$7,600,000.00
*314 On April 1, 1969, Alger took title to Schwab House. [3] Prior thereto Schwab House had been operated by a trustee. Alfred felt that the trustee's management had been poor, and that Schwab House could be made much more profitable by reducing costs and increasing rents (which were below market rates at the time of purchase). Since there were approximately 600 units, a small increase in rents produced a lot of revenue. Alger operated the building from 1969 through 1972, showing a profit in 1969 and 1970, and a loss in 1971 and 1972 (for reasons hereinafter explained). The trusts filed United States Fiduciary Income Tax Returns (Form 1041) for the periods March 27, 1969 to February 28, 1970, March 1, 1970 to February 28, 1971, March 1, 1971 to February 29, 1972, and March 1, 1972 to December 31, 1972. These returns properly reported the respective distributable shares of income earned or loss sustained by Alger for its calendar years 1969 through 1972. This was the only source of income for the trusts. Each trust, as a partner in Alger, *315 received a pro rata distribution from Alger in the amount of $12,500 on December 2, 1969, and $12,500 on December 15, 1970. Each of the Goldsmith Trusts transferred $10,000 to Barbara on December 4, 1969, and $12,500 to her on December 21, 1970. Each of the Goldstein Trusts transferred $10,000 to Ann on December 5, 1969, and $12,500 to her on December 16, 1970. Petitioners accounted for these transfers on their personal books and records as credits against the $300,000 previously loaned to each of the trusts. Rent stabilization laws passed about a year or so after Schwab House was purchased adversely affected the profitability of Schwab House. Consequently, Alger attempted to convert Schwab House into a cooperative in order to make a profit on the investment. This plan failed because of tenant opposition. There was a state law requirement at that time that 35 percent of the tenants had to either approve the conversion to a cooperative or buy their apartments. Petitioners anticipated that if the conversion had been successful Schwab House would have produced a profit of approximately $3,000,000 for Alger. Following the conversion failure, Alger decided to dispose of Schwab *316 House. Alger sold the property for $11,100,000 on November 1, 1972, and shortly thereafter the partnership dissolved. On December 20, 1972, each of the trusts received $237,198.65 as its share of Alger's assets after payment of liabilities. On that same day, each of the Goldsmith Trusts transferred $242,441.75 to Barbara and each of the Goldstein Trusts transferred $242,451.44 to Ann. Petitioners treated these transfers on their respective books and records as credits against the $300,000 advanced to the trusts. These transfers effectively terminated the existence of the trusts as active entities. Petitioners treated the outstanding balance of the loans to the trusts an nonbusiness bad debts. Accordingly, Barbara claimed a $105,175 short-term loss on her 1972 income tax return and Ann and Alfred reported $105,146 short-term loss on their 1972 joint income tax returns. In his statutory notices respondent determined that the petitioners had failed to establish that the "loans" were in fact loans and accordingly disallowed the short-term capital losses.
OPINION The sole issue is whether petitioners were entitled to a nonbusiness bad debt deduction under section 166(d) *317 in 1972 for unrecovered amounts "loaned" to certain trusts in 1969. Respondent contends that the "loans" between petitioners and the trusts were not bona fide debts but rather gifts, advancements or personal or family expenses. On the other hand, petitioners assert that the transfers were bona fide debts, and we agree.
Section 166(d)[4] allows a deduction for a nonbusiness bad debt which becomes worthless within the taxable year, but provides that such loss shall be treated as a short-term capital loss. The regulations provide that to be entitled to a deduction under section 166(d) there must first be a bona fide debt. [5]
*318 A bona fide debt "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs. No deduction may be taken (1) for a loan, repayment of which is contingent upon some event, or (2) for a loan made without a reasonable expectation, belief and intention that the advance be repaid. Zimmerman v. United States,318 F. 2d 611 (9th Cir. 1963). Intra-family transactions are subject to rigid scrutiny and are particularly susceptible to a finding that the transfer was intended as a gift rather than a debt. Estate ofVan Anda v. Commissioner,12 T.C. 1158, 1162 (1949), affd. per curiam 192 F. 2d 391 (2d Cir. 1951). A bona fide debt cannot exist for purposes of section 166 where the obligation to repay the debt is subject to a contingency that has not occurred. Zimmerman v. United States,supra. It is *319 respondent's position that repayment of the funds to petitioners in this case was contingent upon the profitable operation of Schwab House. Respondent asserts that because Schwab House was financially unsuccessful, the requisite contingency never occurred and the debts never became bona fide. In support of his position, respondent points out that partial repayments of the loan were made only in 1969 and 1970, years in which Schwab House was profitable. We are unpersuaded by respondent's arguments. The cases cited by respondent are clearly distinguishable. In United States v. Virgin,230 F. 2d 880 (5th Cir. 1956), the borrower indicated that it was his understanding that the agreement to repay the lender was contingent upon the borrower's finances and health. In Clark v. Commissioner,18 T.C. 780 (1952), affd. 205 F. 2d 353 (2d Cir. 1953), the parties expressly agreed that the obligation to repay would arise only if the borrower's business produced sufficient profits and dividends to enable the borrower to repay the debt. And in Zimmerman v. United States,supra, repayment of the loan was expected only if *320 and when the borrowing organization could carry itself financially without jeopardizing its activities. Based on petitioner's testimony and their actions in recovering as much of the debt as possible, we conclude that petitioners' intentions were not the same as those of the taxpayers in the above cases. In the present case, there were no express (or implicit) agreements between the parties that repayment was contingent upon the production of profits from Schwab House. In one other case cited by respondent, Jewell Ridge Coal Corp. v. Commissioner,318 F. 2d 695 (4th Cir. 1963), the loan was made to a debtor which had no present ability to repay. The debtor would be able to repay only if it became a profitable business. Unlike the facts in Jewell Ridge Coal Corp., at the time petitioners made the loans to the trusts, the trusts had the capacity to repay the loans. That is, the value of the trusts' assets (cash plus the partnership interests in Alger) exceeded the amount of the loan. If respondent's position is taken to the logical extreme, it would be doubtful that any loan could be bona fide. Respondent confuses the concept of a contingency which invalidates *321 the bona fide nature of a loan with the risks that are inherent in any loan transaction. There is always some element of risk that a loan might not be repaid. The existence of this risk does not mean, however, that repayment is contingent on the nonoccurrence of that risk. We find that repayment of petitioners' loans to the trusts was never contingent in the sense that the indebtedness was not bona fide for purposes of section 166.
A determination that the obligation to repay is not contingent on some future event does not necessarily mean the loans are bona fide debts for purposes of section 166. It must also be established by petitioners that the loans were made with a reasonable expectation, belief and intention that they would be repaid. This determination depends upon all the facts and circumstances and, generally, no one fact is determinative. John Kelley Co. v. Commissioner,326 U.S. 521 (1946). Among the common factors considered when making this determination are: (1) whether a note or other evidence of indebtedness exists, Clark v. Commissioner,supra at 783; *322 (2) whether interest is charged, Clark v. Commissioner,supra; (3) whether there is a fixed schedule for repayments, Clark v. Commissioner,supra; (4) whether any security or collateral is requested, Zimmerman v. Unitedstates,supra at 613; (5) whether there is any written loan agreement, Road Materials, Inc. v. Commissioner,407 F. 2d 1121 (4th Cir. 1969); (6) whether a demand for repayment has been made, Zimmerman v. Commissioner,supra; (7) whether the parties' records, if any, reflect the transaction as a loan, Montgomery v. United States,87 Ct. Cl. 218, 23 F. Supp. 130 (1938), cert. denied 307 U.S. 632 (1939); (8) whether any repayments have been made, Estate of Ames v. Commissioner,5 T.C.M. 73, 15 P-H Memo. T.C. par. 46,036 (1946); and (9) whether the borrower was solvent at the time of the loan, Jewell Ridge Coal Corp. v. Commissioner,supra.
The key inquiry is not whether certain indicia of a bona fide loan exist or do not exist, *323 but whether the parties actually intended and regarded the transaction to be a loan. Estate of Van Anda v. Commissioner,supra. The burden is on petitioners to establish the existence of a bona fide loan. Petitioners' intent can be established from an examination of the facts surrounding the transfers to the trusts. For the reasons listed below, we hold that the petitioner met this burden and intended to regard, and at all relevant times did regard the transactions as loans. First, petitioners required the trustees to execute demand promissory notes at the time the loans were made. These notes support the existence of a loan. Second, the trusts, although leveraged, were solvent at the time the loans were made. Presuming Schwab House was purchased at fair market value, the trusts were also solvent at the time the partnership acquired Schwab House. Thus, petitioners' expectation of repayment was reasonable. Third, each petitioner kept personal books and records of her transactions with the trusts and at all times these records reflected the transfers as loans and the repayments as credits against the outstanding balance of the loans. Fourth, *324 the trusts made two interim repayments plus one final liquidating repayment. These repayments indicate that both parties intended to treat the transfers as loans. Fifth, petitioners' loans were secured. Petitioners did not take a security interest in Schwab House in the traditional sense of the term "security interest." This does not mean, however, that petitioners were completely unsecure. Because both petitioners were trustees and Alfred was both a trustee and a partner in Alger, it is difficult to imagine a situation where petitioners would not be aware of events affecting Schwab House. Respondent correctly maintains that if demand for repayment under the notes were made the trustees would be forced to liquidate the partnership. This fact, however, favors petitioners rather than respondent since it means that petitioners were not only in a position of having complete knowledge of the events affecting Schwab House, they were also in a position as creditors of the trusts to force disposal of the property if their equity interest were jeopardized. Although this is not a security interest as is normally envisioned in a loan transaction, it is certainly a hybrid type of security *325 interest which adds to petitioners' claim that the loans are bona fide loans. Sixth, petitioners designed the transactions with the trusts to minimize gift taxes.Accordingly, petitioners made gifts of $20,000 to each trust because they could make them without incurring any gift tax liability. To avoid gift taxes, and to avoid parting permanently with $900,000 each, petitioners chose to transfer the remaining funds in the form of loans to the trusts. Petitioners were aware that the transfers of $300,000 to each trust had to be loans to avoid possible gift tax consequences.
In sum, the trusts executed demand promissory notes evidencing the existence of the loans; the trusts were solvent at the time the loans were made; petitioners kept adequate personal books and records reflecting the transfers and repayments as loans; petitioners were in a secure position although they did not request a security interest in the traditional sense; and petitioners designed the transaction to miniize gift taxes and to retain ownership of the amounts loaned. Based on these facts we conclude petitioners established that they intended to and at all relevant times did regard the transactions as loans *326 and, therefore, we find the transactions to be bona fide loans. Respondent contends that the parties' relationship coupled with the absence of any written loan agreements, any requests for security or collateral, any interest charges, or any fixed repayment schedules, dictates that the transfers ought not to be treated as bona fide loans. With the exception of respondent's assertion that petitioners were unsecure (see discussion, supra), respondent's contentions are true. As noted earlier, however, whether a bona fide loan exists depends upon all the facts and circumstances and no one fact is determinative. John Kelley Co. v. Commissioner,supra.On balance, we conclude that the facts and circumstances support a finding that the loans were bona fide and petitioners are entitled to the short-term capital loss deductions taken in 1972 under section 166(d) for nonbusiness bad debts. Decisions will be entered for the petitioners.
Footnotes
1. These cases have been consolidated for purposes of trial, briefing and opinion.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
A. Joseph I. Lubin withdrew as a partner and was replaced by his wife, Evelyn J. Lubin, pursuant to an agreement dated April 1, 1969. ↩
B. C. Gerald Goldsmith withdrew as a partner by amendment to the partnership certificate effective November 19, 1971.↩
3. Town Assets, Inc., whose vice-president was Alfred, purchased Schwab House at an auction sale on February 20, 1969, for $13,250,000.↩
4. Section 166(d) provides: (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩
5. Section 1.166-1(c), Income Tax Regs., provides: Bona fide debt required. Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166↩.