T.C. Memo. 1997-143


UNITED STATES TAX COURT


NATHANAEL ROMAN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4370-95.                    Filed March 19, 1997.


Nathanael Roman, pro se.

Paul K. Voelker, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined the following deficiencies in, additions to, and accuracy-related penalties on petitioner's Federal income tax:

| Year | Deficiency | Additions to Tax Sec. 6651(a)(1)[1] | Accuracy-Related Penalties Sec. 6662(a) |
|------|-----------|-------------------------------------|----------------------------------------|
| 1989 | $7,083 | $2,960 | $1,417 |

---

[1]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

| 1990 | 6,916 | 3,156 | 1,033 |
| 1991 | 7,232 | -- | 1,446 |

The issues remaining for decision are:[2]

(1) Is petitioner entitled for the years at issue to any deductions claimed for charitable contributions?  We hold that he is not.

(2) Is petitioner entitled for 1990 and 1991 to any Schedule C (Profit or Loss from Business) deductions claimed with respect to TFC Engineering?  We hold that he is not.

(3) Is petitioner entitled for 1989 to treat (a) certain long-term capital losses from the sales of stocks as his losses, (b) certain transactions as giving rise to nonbusiness bad debts, and (c) certain stock as worthless?  We hold that he is not.

---

[2]  Respondent determined in the notice of deficiency (notice) that petitioner is not entitled to the deduction for wages and salaries of $7,633 claimed in Schedule E (Supplemental Income and Loss) (1991 Schedule E) of his 1991 U.S. individual income tax return (return) and that, consequently, he is not entitled to the "total loss" of $6,951 claimed in that schedule, but instead has 1991 Schedule E total income of $682.  Petitioner concedes that he is not entitled to a 1991 Schedule E deduction for wages and salaries in the amount of $7,633 and that he does not have a 1991 Schedule E "total loss" of $6,951.  However, he claims with respect to his 1991 Schedule E (1) that, in addition to the other expenses claimed in that schedule, he is entitled to deduct expenses for (a) contract labor and (b) automobile and travel of $595 and $60, respectively, and (2) that he has "total income" of $26.  In response to those claims, respondent states on brief: "While respondent does not concede that petitioner is entitled to rental expenses in the specific categories or in the specific amounts now claimed, respondent will not dispute that petitioner realized a Schedule E rental gain for 1991 in the amount of $26".  Since respondent does not dispute that petitioner has 1991 Schedule E "total income" of $26, we shall not address petitioner's contentions regarding the deductions to which he claims he is entitled in arriving at that "total income" amount.

(4) Is petitioner liable for 1989 and 1990 for the addition to tax under section 6651(a)(1)?  We hold that he is.

(5) Is petitioner liable for the years at issue for the accuracy-related penalty under section 6662(a)?  We hold that he is to the extent stated herein.

FINDINGS OF FACT[3]

Some of the facts have been stipulated and are so found.[4]

_____

[3]  Unless otherwise indicated, our findings of fact pertain to the years at issue.

[4]  Petitioner contends for the first time on brief (1) that, when this case was called for trial, respondent changed the position which she set forth in the stipulation of facts (stipulation) that the parties had lodged before trial with respect to certain exhibits of petitioner that were attached to that stipulation and which related to his claims for certain charitable contributions, business expenses, nonbusiness bad debts, and long-term capital losses and (2) that respondent therefore violated the terms of that stipulation, thereby resulting in an injustice to petitioner.  We disagree.  The stipulation contained respondent's evidentiary objections and/or statements of position with respect to the stipulated exhibits of petitioner.  Respondent expressly stated therein that, in stipulating that petitioner was attaching certain exhibits to the stipulation, respondent does not stipulate that petitioner is entitled to any of the claimed items to which the exhibits of petitioner relate.  Certain other portions of the stipulation and the exhibits of petitioner attached thereto were not clear to the Court, and at the beginning of the trial of this case the Court asked (1) respondent to clarify certain statements in the stipulation about respondent's position regarding the exhibits of petitioner that were attached to the stipulation, (2) the parties to clarify certain other statements about certain of those exhibits, and (3) the parties to address respondent's evidentiary objections to certain of those exhibits. The Court then (1) ruled on respondent's evidentiary objections and excluded certain portions of the stipulation and the exhibits of petitioner that were attached thereto and (2) received into evidence and made a part of the record in this case the remaining portions of the stipulation and the exhibits that were attached thereto.

At the time the petition was filed, petitioner lived in Las Cruces, New Mexico.

Petitioner, who was an engineer working for the Department of the Army during the years at issue, filed returns for 1989, 1990, and 1991 on February 21, 1992, October 12, 1993, and February 5, 1992, respectively.

Claimed Charitable Contributions

Claimed Charitable Contributions
With Respect to Certain Blank Checks

During 1989, 1990, and 1991, petitioner prepared checks totaling $15,092,[5] $14,100, and $12,695, respectively, on which he left the payee lines blank (blank checks) at the request of one or more individuals whose identity is not disclosed in the record. One of the following or similar handwritten notations appeared on the check stubs (check stubs) for those checks: "Donation", "Lee's Travel Fund & Meals", "Lee's Travel Fund", "Contribution", and "Charitable Donation". The blank checks were deposited into a bank account (TFC account) of Twenty-First Century Corporation (TFC) by Ms. Thelma Spiegel (Ms. Spiegel). Ms. Spiegel, inter alia, served as the bookkeeper for the collection of tithes and charitable contributions of Agape Assemblies, Inc. (Agape) and Body of Christ Church and had the authority to make deposits to, and withdrawals from, the TFC account.

---

[5] Hereinafter, all dollar amounts are rounded to the nearest dollar.

Agape was an organization described in sections 170(c)(2) and 501(c)(3) and listed in respondent's Publication 78, Cumulative List of Organizations described in Section 170(c) of the Internal Revenue Code of 1986 (Publication 78).

Ms. Donna Dorris (Ms. Dorris) was the secretary of Agape and oversaw the work of Ms. Spiegel. Ms. Dorris drew no distinction between Agape and TFC because she considered both organizations to be one and the same.

Claimed Charitable Contributions With
Respect to Certain Additional Checks

During 1989, petitioner wrote a check (check 3448) to Professional Reprographics and a check (check 3534) to R.B. Design & Printing (R.B. Design & Printing) in the amounts of $86 and $874, respectively. The following handwritten notations appeared on the check stubs for check 3448 and check 3534, respectively: "Corrections to Poetry Text" and "Lee Mc's poetry books". A receipt from R.B. Design & Printing indicated that check 3534 was used to pay a bill for 500 70-page poetry books, that a customer named "McWilliams" placed the order for those books, and that Nathanael Roman received those books.

Petitioner wrote two checks (checks 3597 and 3660) during 1989, one check (check 3974) during 1990, and one check (check 4494) during 1991 to Ms. Shirley A. Ridgway (Ms. Ridgway) in the amounts of $545, $550, $270, and $70, respectively. Ms. Ridgway and petitioner, who have known each other for approximately 25

years, are good friends.  The following handwritten notations appeared on the check stubs for checks 3597, 3660, 3974, and 4494, respectively:  "Tithes/mine", "Donation", "Donation Reimbursement", and "Agape Assemblies".

During 1989, petitioner wrote a check to Citizen's Bank (check to Citizen's Bank) in the amount of $540.  The following handwritten notation appeared on the check stub for that check: "TFC Deposit/Donation".[6]

### Return Treatment of Claimed Charitable Contributions

In Schedule A of petitioner's 1989, 1990, and 1991 returns, petitioner claimed deductions for charitable contributions totaling $22,690, $15,456, and $15,210, respectively.

### TFC Engineering

Dona Ana County, New Mexico, issued petitioner a Certificate of Business Registration for calendar year 1985 for an entity called TFC Engineering.  That certificate stated in pertinent part:

> Whereas, a business registration application form has been completed on behalf of the above named individual, partnership or corporation, and the registration fee of $25 has been paid;
>
> Now, therefore, the County of Dona Ana, State of New Mexico, hereby acknowledges receipt of said fee for the calendar year ending December 31, 1985.

During 1990 and 1991, petitioner provided financial support

---

[6]  Checks 3448, 3534, 3597, 3660, 3974, and 4494 and the check to Citizen's Bank are collectively referred to as the additional checks.

to his son Matthew Roman (Matthew Roman) who was, as of the fall of 1990, a 20-year old college student.  Petitioner and Matthew Roman's mother Gloria J. Maldonado (Ms. Maldonado) were divorced sometime in 1974 or 1975.  During 1990 and 1991, Matthew Roman generally resided at petitioner's house during the weekends and at Ms. Maldonado's house during the weekdays.  Pursuant to the divorce decree relating to petitioner's divorce from Ms. Maldonado, petitioner's obligation to support his son ended when his son turned 18 years old.

During 1990 and 1991, petitioner and his son had an agreement under which petitioner was to pay Matthew Roman approximately $130 every several weeks in exchange for, inter alia, bookkeeping, filing, and automobile detailing by Matthew Roman. The following handwritten notation appeared on the check stubs for most of the checks that petitioner's son received from petitioner during 1990 (Matthew Roman's checks):  "Matt's Rm. & Bd.".  Most of Matthew Roman's checks were written either to Ms. Maldonado or the payee lines were left blank; several of those checks were payable to New Mexico State University, University of Nebraska, William T. Baker, D.O, P.A., and Wal-Mart Pharmacy; and none of them was payable to Matthew Roman.

During 1990 and 1991, petitioner wrote 17 checks to Ms. Ridgway (Ms. Ridgway's checks) totaling $2,582.  One of the following handwritten notations appeared on the check stubs for each of 16 of those checks:  "RX-7 Repair[s]", "Taillights RX-7",

"RX-7/Chrysler Ins.", "RX-7 Oil change", "auto advertisement", "Toyota Repair", "Car Insurance", "Auto Repair[s]", "Auto Tax/ Tune-up", "Auto (RX-7) Repair", and "Auto Supplies".  One of Ms. Ridgway's checks, dated January 26, 1990, was for $1,100, and the following handwritten notation appeared on the check stub for that check:  "Business".  None of the handwritten notations on the check stubs for those checks indicated that it was a payment for services rendered by Ms. Ridgway.

In Schedule C of petitioner's 1990 return (1990 Schedule C), petitioner indicated that TFC Engineering's "Principal business" was "Engineering Services" and that it was the first Schedule C filed for TFC Engineering.  The 1990 Schedule C showed a net loss of $6,246, comprised of no gross income, $4,207 in claimed bad debts, and $2,039 in claimed "Wages".  The return that petitioner filed for 1991 did not include a Schedule C for TFC Engineering.

Claimed Stock Sale Losses, Nonbusiness
Bad Debts, and Worthless Stock

### Claimed Stock Sales Losses

From at least the last quarter of 1987 through April 27, 1989, petitioner as custodian for Matthew Roman under the Uniform Gifts to Minors Act (UGMA) of New Mexico maintained an account (Vanguard account) at Vanguard Discount Brokerage Services (Vanguard).  The Social Security number that Vanguard listed for that account was 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.  Petitioner's Social Security number is 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.  Vanguard sent a statement for the last

quarter of 1987 (1987 Vanguard statement) to petitioner as custodian for Matthew Roman under the UGMA of New Mexico that indicated that 45 shares of Daisy Systems Corp. stock (Daisy stock) and 200 shares of Gibraltar Financial Corp. stock (Gibraltar stock) had been purchased for $304 and $700, respectively. Vanguard sent another statement for the last quarter of 1988 (1988 Vanguard statement) to petitioner as custodian for Matthew Roman under the UGMA of New Mexico that showed that those stocks were still being held. (Hereinafter, the 1987 Vanguard statement and the 1988 Vanguard statement shall be referred to collectively as the Vanguard statements.) Vanguard sent to petitioner as custodian for Matthew Roman under the UGMA of New Mexico a form in lieu of Form 1099-B for 1989 (Vanguard 1099) that indicated that on April 27, 1989, the Daisy stock and the Gibraltar stock were sold for $157 and $60, respectively.

### Claimed Nonbusiness Bad Debts

#### Claimed Nonbusiness Bad Debts of Mr. Parra

On October 5, 1988, Richard L. Parra (Mr. Parra) signed a note that stated that he was to repay Nathanael Roman $5,351 at an annual percentage interest rate of 12.5 percent (October 5 note). Mr. Parra was to repay that note in monthly installments of principal and interest totaling $179. On October 7, 1988, Mr. Parra signed another note that stated that he was to repay Nathanael Roman $5,020 at an annual percentage interest rate of 18.2 percent (October 7 note). Mr. Parra was to repay that note

in monthly installments of principal and interest totaling $182.

On or about October 5, 1988, petitioner borrowed $5,351, the same principal amount as the October 5 note, from Air Defense Center Federal Credit Union (ADCFCU loan). The ADCFCU loan bore the same annual percentage interest rate as the October 5 note. On October 7, 1988, petitioner borrowed $5,020, the same principal amount as the October 7 note, from Norwest Financial New Mexico, Inc. (Norwest loan). The Norwest loan bore the same annual percentage interest rate as the October 7 note. During 1989, petitioner repaid the ADCFCU loan and the Norwest loan by using $9,966 that he borrowed from White Sands Federal Credit Union (White Sands loan) at an annual percentage interest rate of 13 percent.

### Claimed Nonbusiness Bad Debt of Mr. McWilliams

On December 15, 1987, Robert L. McWilliams (Mr. McWilliams) signed a note (Mr. McWilliams' note) that stated that he was to repay Nathanael Roman $4,500 at an annual percentage interest rate of 12 percent in monthly installments of principal and interest totaling $275. Mr. McWilliams did not pay any principal or interest on that note. When petitioner learned during 1989 that Mr. McWilliams was unable to pay certain creditors, he determined that Mr. McWilliams did not intend to pay the principal and interest on Mr. McWilliams' note.

### Claimed Nonbusiness Bad Debts of Ms. Parra, Ms. Parra and/or Mr. Parra, and Mr. Ridgway

#### Ms. Parra

On May 19, 1989, petitioner gave Linda Parra (Ms. Parra), Mr. Parra's wife, a check for $500 (Ms. Parra's check). The check stub for that check included the following handwritten notation: "Linda will repay at the rate of $50.00 per week starting 27 May 1989". Ms. Parra did not repay petitioner the amount of Ms. Parra's check.

#### Ms. Parra and/or Mr. Parra

One or more individuals associated with Agape whose identity is not disclosed in the record asked petitioner to pay during 1988 and 1989 that portion of the premium under a group health insurance policy maintained by Agape that was attributable to health coverage for Ms. Parra and/or Mr. Parra and their daughter (insurance payment). Petitioner made one insurance payment during 1988 and two such payments during 1989.[7] Neither Ms. Parra and/or Mr. Parra nor their daughter repaid petitioner the amounts of those insurance payments.

---

[7] The record does not disclose the amounts of those insurance payments during 1988 and 1989.

### Mr. Ridgway

On October 6, 1988, petitioner gave James B. Ridgway (Mr. Ridgway) a check for $300 (Mr. Ridgway's check) that included the following handwritten notation on the check stub for that check: "Auto Purchase Loan".  Mr. Ridgway did not repay the amount of Mr. Ridgway's check.

### Claimed Worthless Stock

On April 17, 1987, petitioner paid $1,000 in return for 1,000 shares of $1 par value common stock of Celebration Products (Celebration), and he received a stock certificate representing those shares.  On May 14, 1988, petitioner paid $2,000 to purchase an additional 2,000 shares of $1 par value Celebration common stock.  However, petitioner received a stock certificate representing only 1,000 of those 2,000 shares.

At all relevant times, Mr. Parra was a principal officer of Celebration.  During 1989, petitioner determined that Mr. Parra was unable to make Celebration into a successful business.

### Return Treatment of Claimed Stock Sale Losses, Nonbusiness Bad Debts, and Worthless Stock

In Schedule D (Capital Gains and Losses) of petitioner's 1989 return (1989 Schedule D), petitioner claimed the following as short-term capital losses:

| | |
|---|---|
| Promissory Note -- Robert L. Parra | $7,500 |
| Promissory Note -- Robert L. Parra | 7,500 |
| Promissory Note -- Robert L. McWilliams | 6,000 |
| Celebration Products Stock | 2,500 |
| Total | 23,500 |

He claimed no short-term capital gains and no long-term capital gains or losses in his 1989 Schedule D. Because of the $3,000 limitation imposed by section 1211(b) for each taxable year on the amount of net capital loss by which an individual may reduce income, petitioner reduced the income reported in his 1989 return by $3,000 of the claimed short-term capital losses reported in his 1989 Schedule D. He carried over the remaining $20,500 of such claimed losses to Schedule D of his 1990 return and reduced the income reported in that return by $3,000 of that claimed loss carryover. Petitioner carried over the remaining $17,500 of that claimed loss carryover to Schedule D of his 1991 return and reduced the income reported in that return by $3,000 of that claimed loss carryover.

In his returns for the years at issue, petitioner did not claim any losses attributable to the sales of the Daisy stock and the Gibraltar stock, the amount of Ms. Parra's check, the amount of the insurance payments, and the amount of Mr. Ridgway's check.

OPINION

Petitioner bears the burden of proving that respondent's determinations in the notice are erroneous and that he is entitled to the tax treatment that he is claiming for the items in dispute. See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

Petitioner testified with respect to the stock sale losses, nonbusiness bad debts, and worthless stock that he is claiming. He did not testify about any other issue in this case. We presume that if he had testified truthfully about those other issues, his testimony would not have been favorable to his position on them. See Cohen v. Commissioner, 9 T.C. 1156, 1162 (1947), affd. 176 F.2d 394 (10th Cir. 1949); Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Claimed Charitable Contribution Deductions

Petitioner contends that he is entitled to deductions for 1989, 1990, and 1991 for charitable contributions that he made to or for the use of Agape in the amounts of $22,690, $15,456, and $15,210, respectively.[8] The parties agree that contributions during the years at issue "to or for the use of" Agape within the meaning of section 170(c) are deductible because Agape was during those years an organization described in sections 170(c)(2) and 501(c)(3) and listed in Publication 78. The issue we must decide is the factual question whether, as petitioner contends, petitioner contributed the amounts at issue to or for the use of

_____

[8] The amounts claimed as charitable contributions to or for the use of Agape in petitioner's returns for the years at issue are greater than the total amounts of the blank checks and the additional checks for 1989, 1990, and 1991 that are part of the record in this case. That record does not establish the reason for those differences, although petitioner contends that they relate to cash contributions that he claims he made to Agape during those years.

Agape. If he did, he is entitled to deduct those contributed amounts under section 170(a).

To support his position, petitioner introduced into evidence (1) check stubs containing, inter alia, the information that appeared on the blank checks and the additional checks;[9] (2) lists that he prepared for each of the years at issue (petitioner's lists) of the blank checks and the additional checks, as well as of the cash, that he claims he contributed to or for the use of Agape during each such year; and (3) the testimony of Ms. Spiegel and Ms. Dorris.

We are unwilling to rely on (1) the check stubs for the blank checks because petitioner left blank the payee lines on the checks represented by those stubs[10] and those checks were deposited into the bank account of TFC[11] and (2) petitioner's lists because they are nothing more than petitioner's self-serving, uncorroborated statements.

---

[9] Respondent does not dispute that the handwritten notations on the check stubs for the checks that petitioner wrote during the years at issue appeared on those checks. Hereinafter, for ease of reference, we shall discuss the handwritten notations on the check stubs that are in evidence as if they appeared on the checks to which those stubs relate.

[10] Ms. Dorris testified that it was the policy of Agape that the payee lines on those checks be left blank. She did not explain the reason for that alleged policy.

[11] Petitioner does not dispute that during the years at issue TFC was not an organization described in secs. 170(c)(2) and 501(c)(3) and that it was not listed in Publication 78. Therefore, we conclude that he does not dispute that contributions made to or for the use of TFC during those years are not deductible under sec. 170(a).

Nor are we willing to accept the testimony of Ms. Spiegel and Ms. Dorris to establish that during the years at issue petitioner contributed the amounts in question to or for the use of Agape. We question Ms. Spiegel's testimony in that regard, which we found to be inconsistent in certain material respects. Although she testified on direct examination that she deposited the blank checks into Agape's account, she admitted on cross-examination that she deposited those checks into the TFC account. In addition, although Ms. Spiegel initially testified on cross-examination that she disbursed the funds from the TFC account to Agape, she later admitted that she disbursed the funds from the TFC account to Mr. McWilliams.

We also found Ms. Dorris' testimony to be unreliable. For example, she drew no distinction in her testimony between Agape and TFC because she considered both organizations to be one and the same. To illustrate, Ms. Dorris testified that petitioner gave her petitioner's lists to review about six weeks prior to trial, that she reviewed those lists, that those lists corresponded with a ledger of contributions to Agape, which was not introduced into evidence, and that the amounts reflected in those lists were deposited into the TFC account.

On the instant record, we find that petitioner has failed to carry his burden of showing that the amounts of the blank checks that he claims he contributed to Agape during each of the years at issue were, in fact, contributed during each such year to or

for the use of that organization within the meaning of section 170(c).

With respect to check 3448 in the amount of $86, the following handwritten notation appeared on that check: "Corrections to Poetry Text". There is no reliable evidence in the record that "Corrections to Poetry Text" was related to a project of Agape.

With respect to check 3534 in the amount of $874 that was payable to R.B. Design & Printing, the following handwritten notation appeared on that check: "Lee Mc's Poetry Books". A receipt from R.B. Design & Printing indicated that check 3534 was used to pay a bill for 500 70-page poetry books, that a customer named "McWilliams" placed the order for those books, and that Nathanael Roman received those books. Ms. Dorris testified that Mr. McWilliams was one of the "members of the ministry". Assuming arguendo that Mr. McWilliams were a member of the ministry of Agape,[12] the record does not disclose whether he was acting in that capacity when he incurred the expense at R.B. Design & Printing that petitioner paid with check 3534.

With respect to checks 3597, 3660, 3974, and 4494 in the respective amounts of $545, $550, $270, and $70 that were payable to Ms. Ridgway, the following handwritten notations appeared on those respective checks: "Tithes/mine", "Donation", "Donation

---

[12] In her testimony, Ms. Spiegel referred to Body of Christ Church. Except for its name, which suggests that Body of Christ Church may have had a ministry, the record discloses no facts about that organization.

Reimbursement", and "Agape Assemblies". As we understand petitioner's position, he claims that he wrote those checks in order to reimburse Ms. Ridgway for contributions that she made on his behalf to Agape during 1989, 1990, and 1991. We do not have an explanation from Ms. Ridgway, who testified with respect to another issue in this case, about the purposes of those checks, nor do we know if she deducted in her returns the funds that petitioner claims she contributed to Agape on his behalf.

With respect to the check to Citizen's Bank, the following handwritten notation appeared on that check: "TFC Deposit/ Donation". Even petitioner's own notation suggests that petitioner made a deposit to a bank account of TFC, and not Agape, at Citizen's Bank.

On the instant record, we find that petitioner has failed to carry his burden of showing that the additional checks (i.e., checks 3448, 3534, 3597, 3660, 3974, and 4494 and the check to Citizen's Bank) represent amounts that petitioner contributed during 1989, 1990, and/or 1991 to or for the use of Agape within the meaning of section 170(c).

### Summary

Based on the entire record before us, we find that petitioner has failed to carry his burden of proving that the amounts of the blank checks and the additional checks (as well as any cash) that he claims he contributed to or for the use of Agape during 1989, 1990, and/or 1991 were, in fact, contributed during

each such year to or for the use of that organization within the meaning of section 170(c). Accordingly, we sustain respondent's determinations disallowing the charitable contributions that petitioner claims for those years.

Claimed Schedule C Deductions
With Respect to TFC Engineering

Petitioner claims on brief (1) that TFC Engineering was engaged during 1990 and 1991 in the business of purchasing, repairing, and reselling automobiles and (2) that that alleged business generated losses during those years of $6,246 and $7,562, respectively.[13] Respondent disputes petitioner's claims.[14]

To support his position with respect to the claimed Schedule C losses for TFC Engineering, petitioner relies on certain documentary and testimonial evidence. The documentary evidence con-

---

[13] Although petitioner reported no income in his 1990 Schedule C with respect to TFC Engineering, he is claiming herein that he did have income for 1990 attributable thereto. Although petitioner deducted certain expenses in his 1990 Schedule C with respect to TFC Engineering, he is claiming herein that he incurred different types and amounts of expenses during 1990 with respect thereto. In addition, although petitioner did not include a Schedule C for TFC Engineering in his return for 1991, he is claiming herein Schedule C gross income and expenses with respect thereto for that year.

[14] Respondent also contends that, because the claimed automobile-related activity of TFC Engineering was not an activity engaged in for profit during 1990 and 1991, pursuant to sec. 183, petitioner is not entitled to deduct any expenses in excess of income. Petitioner does not address respondent's contention under sec. 183. On the record before us, we find that petitioner has failed to establish that the automobile-related activity in which he claims TFC Engineering engaged during 1990 and 1991 is an activity engaged in for profit within the meaning of sec. 183.

sists of (1) lists and summaries, presumably prepared by or on behalf of petitioner (petitioner's summaries), that purport to show with respect to certain automobiles their respective purchase prices, repair or other expenses, and, in certain instances, sales prices; (2) check stubs of petitioner that appear to correspond to certain alleged purchase price and expense amounts shown in petitioner's summaries; and (3) receipts for certain of the expenses shown in those summaries that indicated that the following customers were responsible for the expenses incurred:

| Customer Name | Number of Receipts Listing Customer Name |
|---|---|
| Nathanael Roman | 11 |
| Shirley Ridgway | 8 |
| Matthew Roman | 1 |
| Aunt Shirley's Auto Sales | 1 |
| Robert's Auto Repair | 6 |

We are unwilling to rely on petitioner's self-serving summaries to establish that during 1990 and 1991 he was in the business of purchasing, repairing, and reselling automobiles. Although certain check stubs of petitioner and receipts for repairs that are in evidence support petitioner's position that during 1990 and 1991 he paid the repair and other expenses for certain automobiles, we are not persuaded by the documentary (and other) evidence introduced by petitioner on this issue that during those years he owned the automobiles listed in petitioner's summaries and that he attempted to, and/or did, sell any of those automobiles for profit during those years.

The testimonial evidence regarding the claimed Schedule C losses for TFC Engineering consists of the testimony of Ms. Ridgway and Matthew Roman. Ms. Ridgway testified that around 1989 she managed mobile homes and automobile sales for petitioner. We question Ms. Ridgway's testimony. Indeed, petitioner acknowledges on brief that Ms. Ridgway was mistaken when she testified that she performed those functions for him around 1989. Petitioner claims that Ms. Ridgway did not manage mobile homes for him until 1991. Petitioner also claims that Ms. Ridgway first managed automobile sales for him during 1990. Ms. Ridgway also testified that she received around $2,900 during 1990 and some undisclosed amount during 1991 from TFC Engineering for "sales and organizing the mobile homes, making collections, taking care of repairs, also leasing the mobile homes--taking care of all those things for you." The documentary evidence shows that during 1990 and 1991 petitioner wrote 17 checks to Ms. Ridgway totaling $2,582, 16 of which appear to relate to certain repair and other expenses regarding certain automobiles, one of which for $1,100 contained the handwritten notation "Business", and none of which establishes that those checks were payments for services rendered during those years by Ms. Ridgway to petitioner in the conduct of a business of purchasing, repairing, and re-selling automobiles. In short, we are not persuaded by Ms. Ridgway's testimony (and the other pertinent evidence) that petitioner was engaged in such a business during 1990 and 1991.

Nor did we find the testimony of Matthew Roman, petitioner's son, particularly helpful to petitioner's position that during 1990 and 1991 he was engaged in the business of buying, repairing, and reselling automobiles. Indeed, although he testified that during 1990 petitioner paid him for "bookkeeping, filing, automobile detailing * * * and long-range business planning", Matthew Roman did not even know the nature of the business in which petitioner was allegedly engaged and for which he allegedly worked during 1990 and 1991. On cross-examination, respondent's counsel asked petitioner's son to describe the type of business in which his father was engaged during 1990. Petitioner's son replied: "I believe the -- well, at that time the name of his business was TFC Engineering. And the scope of that is beyond my knowledge."

Based on the entire record before us, we find that petitioner has failed to satisfy his burden of proving that during 1990 and 1991 he was engaged under the name TFC Engineering (or under any other name) in a trade or business within the meaning of section 162(a) of purchasing, repairing, and reselling automobiles. Accordingly, petitioner is not entitled to any of the deductions that he claims for those years with respect to such alleged business of TFC Engineering.

Claimed Stock Sale Losses, Nonbusiness
Bad Debts, and Worthless Stock

### Claimed Stock Sale Losses

Petitioner claims that during 1989 he realized long-term

capital losses of $147 and $640 on the respective sales of the Daisy stock and the Gibraltar stock. At trial, petitioner presented the Vanguard statements and the Vanguard 1099 for 1989, the year in which the Daisy stock and the Gibraltar stock were sold. Those documents show that at least during the last quarter of 1987 to April 27, 1989, those stocks were held in an account at Vanguard by Nathanael Roman as custodian for his son Matthew Roman under the UGMA of New Mexico. The Social Security number listed on the Vanguard statements and the Vanguard 1099 for the Vanguard account was 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. Petitioner's Social Security number is 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. The Vanguard 1099 indicated that on April 27, 1989, Nathanael Roman as custodian for Matthew Roman under the UGMA of New Mexico sold the Daisy stock and the Gibraltar stock. No evidence was offered at trial to contradict the Vanguard statements and the Vanguard 1099, although we note that, pursuant to the UGMA of New Mexico, petitioner should have delivered the Daisy stock and the Gibraltar stock to his son when he became 18 on December 3, 1987. See N.M. Stat. Ann. sec. 46-7-4(D) (Michie 1978) (repealed July 1989).

Under New Mexico law in effect during all relevant times, "A gift made in a manner prescribed in the Uniform Gifts to Minors Act * * * is irrevocable and conveys to the minor indefeasibly vested legal title to the security". N.M. Stat. Ann. sec. 46-7-3(A) (Michie 1978) (repealed July 1989). A transfer under the UGMA properly made under State law is effective to transfer the

incidence of income taxation from the parent to the child except to the extent that custodial funds are used to discharge the support obligation of the parent. J.T. Henry & Associates, Inc. v. Commissioner, 80 T.C. 886, 890 (1983). The record does not show whether there were any dividends from the Daisy stock or the Gibraltar stock that petitioner used to support his son while he was a minor (i.e., prior to December 3, 1987, when he became 18).

Based on the entire record before us, we find that petitioner has failed to satisfy his burden of proving that he owned the Daisy stock and the Gibraltar stock on April 27, 1989, the date on which those stocks were sold. Accordingly, we reject petitioner's claim that during 1989 he realized long-term capital losses on the sales of those stocks.

Claimed Nonbusiness Bad Debts

Section 166(d) allows a deduction for a nonbusiness debt that becomes worthless during the taxable year. A nonbusiness debt is defined in section 166(d)(2) as a debt other than (1) a debt created or acquired in connection with a trade or business of the taxpayer or (2) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

Only a bona fide debt qualifies as debt for purposes of section 166. A bona fide debt is a debt that arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. Whether a bona fide debtor-creditor

relationship exists is a question of fact to be determined upon a consideration of all the pertinent facts and circumstances. Fisher v. Commissioner, 54 T.C. 905, 909 (1970). An essential consideration is whether there exists a good faith intent on the part of the alleged creditor to enforce repayment and a good faith intent on the part of the alleged debtor to make repayment. See id.

The following factors have been taken into account by this Court and other courts in determining whether such a good faith intention of repayment exist: (1) Whether a note or other evidence of indebtedness exists, Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953); (2) whether interest is charged, id.; (3) whether there is a fixed schedule for repayments, id.; (4) whether a demand for repayment has been made, Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); and (5) whether at the time the loan was allegedly made the alleged borrower had the ability to repay it, Jewell Ridge Coal Corp. v. Commissioner, 318 F.2d 695, 699 (4th Cir. 1963), affg. T.C. Memo. 1962-194.

In general, the determination of whether a debt is worthless is a question of fact, and all pertinent evidence must be considered, including the value of collateral, if any, securing the debt and the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs.

Section 166(b) provides that the amount of the deduction for

any bad debt is the adjusted basis provided in section 1011.  As
pertinent here, section 1011(a) defines the term "adjusted basis"
as the basis determined under section 1012, adjusted as provided
under section 1016, and section 1012 provides that the basis of
property is its cost.

### Claimed Nonbusiness Bad Debts of Mr. Parra

At the conclusion of the trial in this case, respondent
conceded that the October 5 and the October 7 notes were loans
and that petitioner is entitled to treat the respective principal
amounts of those notes as nonbusiness bad debts for 1989.  As we
understand petitioner's position, he contends that, in addition
to the principal amounts conceded by respondent with respect to
the October 5 and October 7 notes, he is entitled for 1989 to
treat as a nonbusiness bad debt the interest due on the October 5
and the October 7 notes.[15]  Respondent disputes petitioner's
contention.  We agree with respondent.

The record does not establish that petitioner, a cash basis
taxpayer, included in income for any year interest payments, if
any, on the October 5 and the October 7 notes.  Consequently,
petitioner has failed to show that he has any basis in that
interest.

---

[15]  It is not clear from the record whether petitioner deducted
the interest that he paid on the ADCFCU loan, the Norwest loan,
and/or the White Sands loan under sec. 163(a), as limited by sec.
163(h).  In any event, we do not understand petitioner to contend
that he is entitled for 1989 to an interest expense deduction
with respect to those loans.

On the record before us, we find that petitioner has failed to prove that he is entitled for 1989 to treat as a nonbusiness bad debt the interest on the October 5 and the October 7 notes.

### Claimed Nonbusiness Bad Debt of Mr. McWilliams

Petitioner contends that the aggregate amount of principal and interest on Mr. McWilliams' note is a bona fide debt that became worthless during 1989. Petitioner introduced into evidence a note signed by Mr. McWilliams on December 15, 1987, which stated that Mr. McWilliams was to repay Nathanael Roman $4,500 at an annual percentage interest rate of 12 percent in monthly installments of principal and interest totaling $275. In addition, petitioner testified that: (1) He lent Mr. McWilliams the amount represented by Mr. McWilliams' note, (2) during 1989 Mr. McWilliams was unable to pay certain creditors, and (3) he determined that Mr. McWilliams was unable to pay the aggregate amount of the principal and interest on Mr. McWilliams' note.

Based on petitioner's documentary and testimonial evidence regarding Mr. McWilliams' note, we find that the aggregate amount of the principal and interest on Mr. McWilliams' note is a bona fide debt within the meaning of section 166. We must now determine whether petitioner has shown that that debt became worthless during 1989. The only evidence presented at trial with respect to the worthlessness of Mr. McWilliams' note was petitioner's testimony that during 1989 he determined that Mr. McWilliams was unable to pay certain creditors. More than petitioner's belief

that Mr. McWilliams' note became worthless during 1989 is required to prove that it did become worthless during that year. See Aagaard v. Commissioner, 56 T.C. 191, 209 (1971).

Based on our review of the instant record, we find that petitioner has failed to carry his burden of proving that Mr. McWilliams' note became worthless during 1989. Accordingly, we sustain respondent's determination that petitioner is not entitled for that year to treat any amount of Mr. McWilliams' note as a nonbusiness bad debt.

### Claimed Nonbusiness Bad Debts of Ms. Parra, Ms. Parra and/or Mr. Parra, and Mr. Ridgway

Petitioner contends that he is entitled for 1989 to treat the following as nonbusiness bad debts under section 166: The amount of Ms. Parra's check; the undisclosed amounts of the insurance payments that petitioner made; and the amount of Mr. Ridgway's check. The record does not show that there was any interest required to be paid on, that petitioner expected or demanded repayment of, or that the alleged debtors believed that they were required to repay those alleged loans. Nor does the record show the financial condition of any of the alleged debtors at the times (1) petitioner allegedly lent them the amounts in question and (2) petitioner determined that the alleged loans became worthless.

Based on our review of the instant record, we find that petitioner has failed to carry his burden of proving (1) that the amounts of Ms. Parra's check, the insurance payments, and Mr.

Ridgway's check were bona fide debts within the meaning of section 166 and (2) that, assuming arguendo that such amounts were bona fide debts, they became worthless during 1989. Accordingly, we reject petitioner's claim that he is entitled for that year to treat such amounts as nonbusiness bad debts.

Claimed Worthless Stock

Petitioner contends that the 3,000 shares of Celebration common stock that he purchased on April 17, 1987, and May 14, 1988, became worthless during 1989 and that he is entitled for that year to treat that stock as worthless stock under section 165(g).

Section 165(a) and (g) permits a capital loss deduction for worthless stock for the taxable year during which such stock becomes worthless. Our resolution of the question presented here under section 165(g) depends on the facts and circumstances relating to the Celebration stock at issue. See Lincoln v. Commissioner, 24 T.C. 669, 694 (1955), affd. 242 F.2d 748 (6th Cir. 1957).

The only evidence presented by petitioner about the worthlessness of the Celebration stock is his testimony that he determined during 1989 that Mr. Parra was unable to make Celebration into a successful business. Petitioner's belief that the Celebration stock at issue became worthless during 1989 is not enough to persuade us that that stock did become worthless during that year. See Aagaard v. Commissioner, supra.

On the instant record, we find that petitioner has failed to satisfy his burden of proving that the Celebration stock became worthless during 1989.  Accordingly, we sustain respondent's determination that petitioner is not entitled for that year to treat that stock as worthless under section 165(g).

Section 6651(a)(1)

Respondent determined that petitioner is liable for each of the years 1989 and 1990 for the addition to tax under section 6651(a)(1) for failing to file timely his return for each of those years.  Although petitioner presented no evidence at trial with respect to those determinations, he contends on brief that, because he believed that he overpaid his taxes for 1989 and 1990 and that he was owed a refund for those years, he did not have to file returns for 1989 and 1990.  In the 1989 and 1990 returns that petitioner filed late, he reported gross income of $61,340 and $65,948, respectively, and claimed "Head of household" status and two exemptions totaling $4,000 and $4,100, respectively.  There is no determination in the notice that petitioner is not entitled to the head of household status and the two exemptions that he claimed in those returns.

Section 6012(a)(1)(A) generally requires that every individual whose gross income for the taxable year equals or exceeds the "exemption amount" must file a return.  The term "exemption amount" has the same meaning as provided in section 151(d).  Sec. 6012(a)(1)(D)(ii).  Certain exceptions apply to the general re-

quirement set forth in section 6012(a)(1)(A). As pertinent here, section 6012(a)(1)(A)(ii) provides that an individual who qualifies as a "Head of household"--a term defined in section 6012(a)(1)(A)(i) to have the same meaning as provided in section 2(b)--is not required to file a return if that individual's gross income for the taxable year is less than the sum of the exemption amount and the "basic standard deduction" applicable to such individual. The term "basic standard deduction" is defined in section 6012(a)(1)(D)(i) to have the same meaning as provided in section 63(c)(2). According to the return that petitioner filed late for each of the years 1989 and 1990, his gross income exceeded the sum of the exemption amount and the basic standard deduction for each such year. He therefore was required to file a return for each of the years 1989 and 1990.

On the instant record, we find that petitioner has failed to satisfy his burden of proving that his failure to file timely his returns for 1989 and 1990 was due to reasonable cause, and not willful neglect. Accordingly, we sustain respondent's determinations for those years imposing the addition to tax under section 6651(a)(1).

Section 6662(a)

Section 6662(a) imposes a penalty equal to 20 percent of the underpayment of tax attributable to, inter alia, any substantial understatement of income tax. Sec. 6662(b)(2). With respect to individuals, an understatement of income tax is substantial if it

exceeds the greater of 10 percent of the tax required to be shown in the return or $5,000.  Sec. 6662(d)(1)(A).  An understatement of income tax is equal to the amount of tax required to be shown in the return less the amount shown therein (reduced by any rebate within the meaning of section 6211(b)(2)).  Sec. 6662(d)(2)(A).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability and the knowledge and experience of the taxpayer.  Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent determined that petitioner's substantial understatement of income tax (1) for 1989 and 1990 is attributable to the $3,000 capital loss deduction and the charitable contribution deduction claimed by petitioner for each of those years and (2) for 1991 is attributable to those claimed deductions as well as the $7,633 deduction for wages and salaries that petitioner claimed in his 1991 Schedule E.

With respect to the $3,000 capital loss deduction that petitioner claimed for each of the years at issue, respondent concedes that petitioner is entitled to treat the October 5 and

the October 7 notes in the respective principal amounts of $5,351 and $5,020 as nonbusiness bad debts for 1989.  Pursuant to respondent's concession, petitioner is entitled to a $3,000 capital loss deduction for each of the years at issue.  Secs. 1221(b), 1212(b).  Consequently, there is no substantial understatement of income tax for each of those years that is attributable to the $3,000 capital loss deduction claimed by petitioner for each such year.

With respect to the charitable contribution deduction that petitioner claimed for each of the years at issue, petitioner contends that he is entitled to those deductions and that therefore respondent erred in imposing the accuracy-related penalty with respect to them.  We disagree.  We have sustained herein respondent's determinations disallowing the charitable contribution deductions claimed by petitioner for the years at issue.  On the record before us, we sustain respondent's determinations imposing the accuracy-related penalty for each such year to the extent that it is attributable to those claimed deductions.

With respect to the $7,633 deduction for wages and salaries claimed by petitioner in his 1991 Schedule E, that claimed deduction resulted in a 1991 Schedule E "total loss" of $6,951 that petitioner used to reduce his income for 1991.  Petitioner concedes that he is not entitled to the $7,633 deduction for wages and salaries and the $6,951 "total loss" that he claimed in his 1991 Schedule E.  However, he contends (1) that, in addition

to the other deductions that he claimed in that schedule, he is entitled to deduct $595 for contract labor expenses and $60 for automobile and travel expenses and (2) that he has 1991 Schedule E "total income" of $26. On the record before us, we sustain respondent's determination imposing the accuracy-related penalty for 1991 to the extent that it is attributable to the $7,633 expense deduction, and resulting "total loss", that petitioner claimed in his 1991 Schedule E.

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.